ROBBINS LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsllp.com
KEVIN A. SEELY (199982)
kseely@robbinsllp.com
MATTHEW G. LEAGRE (*pro hac pending*)
mleagre@robbinsllp.com
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| REYNOLDS FAMILY REVOCABLE TRUST U/A DATED 04/08/2015, Derivatively on Behalf of THE CHARLES SCHWAB CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES R. SCHWAB, WALTER W. BETTINGER II, PETER CRAWFORD, JOSEPH R. MARTINETTO, JOHN K. ADAMS, JR., CHRISTOPHER V. DODDS, STEPHEN A. ELLIS, MARK A. GOLDFARB, FRANK C. HERRINGER, ARUN SARIN, PAULA A. SNEED, CHARLES A. RUFFEL, JOHN T. DEA, C. PRESTON BUTCHER, STEPHEN T. MCLIN, ROGER O. WALTHER, ROBERT N. WILSON, and WILLIAM S. HARAF,<br><br>Defendants,<br><br>-and-<br><br>THE CHARLES SCHWAB CORPORATION, a Delaware Corporation,<br><br>Nominal Defendant. | Case No. 4:23-cv-02938-YGR<br><br>AMENDED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br>DEMAND FOR JURY TRIAL<br><br>(San Francisco Superior Court Case No. CGC-23-607047)<br><br>Judge: Yvonne Gonzalez Rogers<br><br>Action Filed in Superior Court: June 12, 2023<br>Amended Complaint filed: August 31, 2023 |

Plaintiff, by its attorneys, submits this Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources. Plaintiff also demanded and received from The Charles Schwab Corporation ("Charles Schwab" or the "Company") certain of its internal books and records pursuant to 8 Del. C. §220 (the "220 Documents").

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Charles Schwab against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in at least $187 million in damages to Charles Schwab. The faithless actions of the Company's fiduciaries have also resulted in significant damages to Charles Schwab's reputation, goodwill, and standing in the business community, as well as exposed the Company to liability for violations of state and federal law.

2. Charles Schwab is an American multinational financial services company. Charles Schwab, together with its subsidiaries, provides wealth management, securities brokerage, banking, asset management, and investment advisory services. In 2015, the Company launched its "robo-advisor" investment-advice program called Schwab Intelligent Portfolios ("Intelligent Portfolios" or "SIP"). A robo-advisor is a digital platform that provides automated, algorithm-driven financial planning and investment services with little to no human supervision. The use of robo-advisor programs by everyday investors has been on the rise. Charles Schwab introduced SIP and offered a version of the portfolios with purportedly no fees to differentiate the Company from its competitors, including Robinhood Markets, Inc. ("Robinhood"). Charles Schwab faced increasing pressure to innovate while Robinhood was gaining market share due to its commission-free trading and the showcase of its application in December 2014. Robinhood's application launched in March 2015 and was met by high engagement from the millennial demographic.

3. From March 2015 through at least November 2018, the Company's fiduciaries made and/or caused Charles Schwab to make materially misleading statements in public filings and public statements concerning the negative effect of preset SIP cash allocations on SIP customer returns, the revenues Charles Schwab generated from SIP, and the resultant conflict of interest Charles Schwab had with SIP customers. In particular, Charles Schwab claimed that SIP was a no-fee product, that cash allocations within the portfolios were determined through a "disciplined portfolio construction methodology," and that there was only a "potential" conflict of interest in setting the cash allocation amounts.

4. Regardless, Charles Schwab claimed that SIP included no hidden fees, and that SIP portfolios were designed to balance performance and risk, among other factors. These claims attracted investors to SIP in part because most of the Company's competitors charged advisory fees as a precondition to use their services. However, Charles Schwab's disclosures concerning SIP were deficient and misleading.

5. SIP had a hidden fee through its use of preset amounts of cash allocations. The preset cash allocations created a "cash-drag" that would allow Charles Schwab to earn at least a minimum amount of revenue from the spread on the SIP cash by loaning out the money. Effectively, SIP was structured so that the portfolios would cause the Company to receive the same amount of revenue from clients as if Charles Schwab had charged them an advisory fee. Contrary to the Company's claims, the portfolios were ***not*** structured based on disciplined portfolio construction methodology because the cash allocations were preset in order to maximize revenue for the Company. Accordingly, an actual conflict of interest existed between investors and the Company.

6. Further, the Company's fiduciaries did not disclose that, under normal market conditions where other assets such as equities would outperform cash, the cash allocations in investors' portfolios would lower clients' returns by approximately the same amount an advisory fee would have, while simultaneously generating revenue for the Company. Thus, Charles Schwab effectively charged its SIP clients a hidden fee while claiming the opposite, provided a worse product in order to ensure the Company made this minimum amount of revenue, failed to disclose its conflict of interest with SIP customers, and falsely implied that investing in SIP allowed investors to keep more of their money than other advisory

services that disclosed and assessed their fees up front. By obscuring its conflict of interest and misrepresenting the costs associated with investing in SIP, the Company profited at the expense of its clients and the investing public.

7. The truth behind the SIP cash allocations and Charles Schwab's conflict of interest emerged on June 13, 2022, when the SEC announced that it agreed to a Cease-and-Desist Order with the Company (the "Order"). The Order detailed how from March 2015 through November 30, 2018, the Company had misled investors regarding the hidden fees and the effects of the cash allocations. The SEC determined that a false advertising campaign had effectively caused investors to be "unable to make a fully informed decision regarding whether the lack of an advisory fee benefited them." The SEC cited several violations of the Investment Advisers Act of 1940 (the "Advisers Act"). As part of the resolution, the Company and its subsidiaries agreed to pay ***$187 million***. The payment consists of approximately $52 million in disgorgement and a $135 million civil penalty. The resolution also requires Charles Schwab and its subsidiaries to undergo certain corporate governance reforms and agree to cease-and-desist from violating the antifraud provisions of the Advisers Act.

## JURISDICTION AND VENUE

8. Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff resides in Hawaii, which is a state other than the state(s) in which Defendants are citizens as asserted by Defendants in their removal of this case from state court.

9. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties

owed to Charles Schwab, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

11. Plaintiff Reynolds Family Revocable Trust u/a dated 04/08/2015 was a stockholder of Charles Schwab at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Charles Schwab stockholder.

### Nominal Defendant

12. Nominal defendant Charles Schwab is a Delaware savings and loan holding company. As of December 31, 2022, Charles Schwab had $7.05 trillion in client assets, 33.8 million active brokerage accounts, 2.4 million corporate retirement plan participants, and 1.7 million banking accounts. The Company engages, through its subsidiaries, in wealth management, securities brokerage, banking, asset management, custody, and investment advisory services. As of December 31, 2022, Charles Schwab had full-time, part-time, and temporary employees, and persons employed on a contract basis, that represented the equivalent of approximately 35,300 full-time employees.

### Current Executive/Director Defendants

13. Defendant Charles R. Schwab ("Schwab") has been the Company's founder since 1971. Defendant Charles R. Schwab was the Company's Chief Executive officer ("CEO") from 1986 to 1997 and 2004 to 2008. Defendant Schwab was the Company's Co-Chief Executive Officer from 1998 to 2003. Defendant Schwab has been Charles Schwab & Co., Inc.'s founder since 1971 and served as CEO from 2004 to 2008. Defendant Schwab was Chairman and trustee of The Charles Schwab Family of Funds, Schwab Investments, Schwab Capital Trust, Schwab Annuity Portfolios, and Laudus Trust, through 2015. Defendant Schwab has been Charles Schwab Bank, SSB's ("CSB" or "Schwab Bank") Co-Chairman since July 2022. Defendant Schwab has been the Company's Co-Chairman and director since 2022. Defendant Schwab was the Company's Chairman and director from 1986 to 2022. The Company paid defendant Schwab the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $792,308 | $3,000,022 | $2,000,013 | $2,093,871 | $16,220 | $7,902,434 |
| 2021 | $750,000 | $2,700,000 | $1,800,000 | $2,561,625 | $14,998 | $7,826,623 |
| 2020 | $741,667 | $2,340,000 | $1,560,000 | $1,451,256 | $14,732 | $6,107,655 |
| 2019 | $700,000 | $1,850,000 | $1,850,000 | $1,717,975 | $14,482 | $6,132,457 |
| 2018 | $683,333 | $1,725,000 | $1,725,000 | $1,906,500 | $14,428 | $6,054,261 |
| 2017 | $583,333 | $1,650,000 | $1,650,000 | $1,583,021 | $53,119 | $5,519,473 |
| 2016 | $500,000 | $1,500,000 | $1,500,000 | $4,582,800 | $60,273 | $8,143,073 |
| 2015 | $500,000 | $1,500,000 | $1,500,000 | $1,238,000 | $62,269 | $4,800,269 |

14. Defendant Walter W. Bettinger II ("Bettinger") has been the Company's CEO and a director since 2008. Defendant Bettinger was the Company's President from 2008 to 2021. Defendant Bettinger was the Company's President and Chief Operating Officer from 2007 to 2008. Defendant Bettinger was the Company's President of Investor Services from 2005 to 2007. Defendant Bettinger was the Company's Executive Vice President and Chief Operating Officer of Investor Services from 2004 to 2005. Defendant Bettinger was the Company's President of Corporate & Retirement Services from 1995 to 2004. Defendant Bettinger has been the CSB's Co-Chairman since at least July 2022. Defendant Bettinger has been a trustee of The Charles Schwab Family Funds, Schwab Investments, Schwab Capital Trust, Schwab Annuity Portfolios, Laudus Trust, and Schwab Strategic Trust, all registered investment companies managed by an affiliate of the company since at least March 2009. Defendant Bettinger was Schwab Investor Services Executive Vice President and President from 2005 to 2007. Defendant Bettinger has been the Company's Co-Chairman since 2022. The Company paid defendant Bettinger the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $1,484,615 | $10,200,043 | $6,800,011 | $5,885,200 | $16,460 | $24,386,329 |
| 2021 | $1,400,000 | $8,010,000 | $5,340,000 | $7,172,550 | $15,854 | $21,938,404 |
| 2020 | $1,383,333 | $6,300,000 | $4,200,000 | $4,060,256 | $15,604 | $15,959,193 |
| 2019 | $1,300,000 | $5,000,000 | $5,000,000 | $4,785,787 | $15,354 | $16,101,141 |
| 2018 | $1,275,000 | $4,500,000 | $4,500,000 | $5,335,875 | $16,732 | $15,627,607 |
| 2017 | $1,133,333 | $4,250,000 | $4,250,000 | $4,613,375 | $102,029 | $14,348,737 |
| 2016 | $1,041,667 | $3,875,000 | $3,875,000 | $10,639,350 | $116,632 | $19,547,649 |
| 2015 | $1,000,000 | $3,750,000 | $3,750,000 | $3,714,000 | $123,373 | $12,337,373 |

**Current Executive Defendants**

15. Defendant Peter Crawford ("Crawford") has been the Company's and Charles Schwab & Co., Inc.'s Chief Financial Officer since 2017. Defendant Crawford has been a Charles Schwab and Charles Schwab & Co., Inc. managing director since 2022. Defendant Crawford was the Company's Executive Vice President from 2017 to 2022. Defendant Crawford was Charles Schwab & Co., Inc.'s Executive Vice President of Finance from 2015 to 2017. Defendant Crawford was Senior Vice President of Charles Schwab's asset management and client solutions organization from 2008 to 2015. Defendant Crawford has been Charles Schwab & Co., Inc.'s director since 2018. The Company paid defendant Crawford the following compensation:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2022 | $688,462 | - | $1,800,045 | $1,200,016 | $1,455,545 | $16,133 | $5,160,201 |
| 2021 | $621,073 | - | $2,550,000 | $1,700,000 | $1,697,019 | $15,412 | $6,583,504 |
| 2020 | $587,500 | - | $900,000 | $600,000 | $919,672 | $15,080 | $3,022,252 |
| 2019 | $516,667 | - | $625,000 | $625,000 | $887,620 | $14,774 | $2,669,061 |
| 2018 | $470,833 | - | $500,000 | $500,000 | $788,175 | $15,069 | $2,274,077 |
| 2017 | $444,167 | $76,325 | $500,000 | $500,000 | $482,142 | $17,754 | $2,020,388 |

16. Defendant Joseph R. Martinetto ("Martinetto") has been the Company's and Charles Schwab & Co., Inc.'s Chief Operating Officer since 2018. Defendant Martinetto has been a Charles Schwab and Charles Schwab & Co., Inc. managing director since 2022. Defendant Martinetto was the Company's and Charles Schwab & Co., Inc.'s Senior Executive Vice President from 2015 to 2022. Defendant Martinetto was the Company's and Charles Schwab & Co., Inc.'s Chief Financial Officer from 2007 to 2017. Defendant Martinetto was the Company's and Charles Schwab & Co., Inc.'s Executive Vice President from 2007 to 2015. Defendant Martinetto has been a Charles Schwab & Co., Inc.'s director since June 2021. Defendant Martinetto has been the CSB's Co-Chairman since at least February 2023. Defendant Martinetto was a trustee of The Charles Schwab Family of Funds, Schwab Investments, Schwab Capital Trust, Schwab Annuity Portfolios, Laudus Trust, and Schwab Strategic Trust from 2016 to 2022. The Company paid defendant Martinetto the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | $879,231 | $3,600,010 | $2,400,011 | $2,788,305 | $16,234 | $9,683,791 |
| 2021 | $759,188 | $4,950,000 | $3,300,000 | $2,437,425 | $15,554 | $11,462,167 |
| 2020 | $723,333 | $1,950,000 | $1,300,000 | $1,273,844 | $15,273 | $5,262,450 |
| 2019 | $700,000 | $1,625,000 | $1,625,000 | $1,443,099 | $15,023 | $5,408,122 |
| 2018 | $687,500 | $1,500,000 | $1,500,000 | $1,611,225 | $15,485 | $5,314,210 |
| 2017 | $625,000 | $1,000,000 | $1,000,000 | $1,356,875 | $36,647 | $4,018,522 |
| 2016 | $625,000 | $1,000,000 | $1,000,000 | $3,662,325 | $39,713 | $6,327,038 |
| 2015 | $610,417 | $1,125,000 | $1,125,000 | $1,209,113 | $38,762 | $4,108,292 |

**Current Director Defendants**

17. Defendant John K. Adams, Jr. ("Adams") has been a Charles Schwab director since January 2015. Defendant Adams has been a CSB director since 2015. Defendant Adams was a member of the Company's Audit Committee from at least March 2015 to March 2019. Defendant Adams has been the Audit Committee's Chairman since March 2020. Defendant Adams was a member of the Company's Risk Committee from at least March 2015 to March 2020. The Company paid defendant Adams the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $185,000 | $129,007 | $86,018 | - | $400,025 |
| 2021 | $175,000 | $111,000 | $74,000 | - | $360,000 |
| 2020 | $190,000 | $111,000 | $74,000 | - | $375,000 |
| 2019 | $236,500 | $155,000 | $80,000 | - | $471,500 |
| 2018 | $245,000 | $155,000 | $80,000 | - | $480,000 |
| 2017 | $236,500 | $135,000 | $70,000 | $2,510 | $444,010 |
| 2016 | $233,000 | $135,000 | $70,000 | $1,406 | $439,406 |
| 2015 | $198,222 | $100,834 | $64,167 | $385 | $363,608 |

18. Defendant Christopher V. Dodds ("Dodds") has been a Company director since October 2014. Defendant Dodds was the Company's Chief Financial Officer from 1999 to May 2007, and Executive Vice President from 1998 to May 2007. Defendant Dodds has been a CSB director since 2007. Defendant Dodds was Charles Schwab & Co., Inc.'s Chief Financial Officer from 1999 to 2007, and Executive Vice President from 1998 to 2007. Defendant Dodds was Charles Schwab & Co., Inc.'s Corporate Controller from 1997 to 1999, Corporate Treasurer from 1993 to 1997. Defendant Dodds was

a member of the Company's Audit Committee from at least March 2015 to March 2020. Defendant Dodds has been Chairman of the Company's Risk Committee since March 2015. The Company paid defendant Dodds the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $185,000 | $129,007 | $86,018 | - | $400,025 |
| 2021 | $175,000 | $111,000 | $74,000 | - | $360,000 |
| 2020 | $190,000 | $111,000 | $74,000 | - | $375,000 |
| 2019 | $255,500 | $155,000 | $80,000 | - | $490,500 |
| 2018 | $264,000 | $155,000 | $80,000 | - | $499,000 |
| 2017 | $253,500 | $135,000 | $70,000 | $2,760 | $461,260 |
| 2016 | $247,000 | $135,000 | $70,000 | $1,891 | $453,891 |
| 2015 | $223,333 | $110,000 | $70,000 | $1,105 | $404,438 |

19. Defendant Stephen A. Ellis ("Ellis") has been a Company director since October 2012. Defendant Ellis has been a member of the Company's Audit Committee since March 2017. Defendant Ellis was a member of the Company's Risk Committee from at least March 2015 to March 2017. The Company paid defendant Ellis the following compensation:

| Fiscal Year | Cash | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2022 | - | $135,000 | $129,007 | $86,018 | - | $350,025 |
| 2021 | - | $125,000 | $111,000 | $74,000 | - | $310,000 |
| 2020 | $62,500 | $62,500 | $111,000 | $74,000 | - | $310,000 |
| 2019 | $62,500 | $62,500 | $80,000 | $80,000 | - | $285,000 |
| 2018 | - | $125,000 | $80,000 | $80,000 | - | $285,000 |
| 2017 | $62,500 | $62,500 | $70,000 | $70,000 | $1,640 | $266,640 |
| 2016 | $62,500 | $62,500 | $70,000 | $70,000 | $1,570 | $266,570 |
| 2015 | $57,500 | $57,500 | $70,000 | $70,000 | $1,497 | $256,497 |

20. Defendant Mark A. Goldfarb ("Goldfarb") has been a Company director since December 2012. Defendant Goldfarb was a member of Schwab Strategic Trust's Trustee Board from 2009 to 2012. Defendant Goldfarb has been a CSB director since 2021. Defendant Goldfarb was the Company's Audit Committee Chairman from at least March 2015 to March 2019. Defendant Goldfarb has been a member of the Company's Audit Committee since March 2020. The Company paid defendant Goldfarb the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $155,000 | $129,007 | $86,018 | - | $370,025 |
| 2021 | $146,889 | $111,000 | $74,000 | - | $331,889 |
| 2020 | $115,000 | $111,000 | $74,000 | - | $300,000 |
| 2019 | $140,000 | $80,000 | $80,000 | - | $300,000 |
| 2018 | $150,000 | $80,000 | $80,000 | - | $310,000 |
| 2017 | $145,000 | $70,000 | $70,000 | $1,640 | $286,640 |
| 2016 | $145,000 | $70,000 | $70,000 | $1,570 | $286,570 |
| 2015 | $130,000 | $70,000 | $70,000 | $1,451 | $271,451 |

21. Defendant Frank C. Herringer ("Herringer") has been a Company director since October 1996. The Company paid defendant Herringer the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $165,000 | $129,007 | $86,018 | - | $380,025 |
| 2021 | $135,000 | $111,000 | $74,000 | - | $320,000 |
| 2020 | $135,000 | $111,000 | $74,000 | - | $320,000 |
| 2019 | $135,000 | $80,000 | $80,000 | - | $295,000 |
| 2018 | $135,000 | $80,000 | $80,000 | - | $295,000 |
| 2017 | $135,000 | $70,000 | $70,000 | $1,640 | $276,640 |
| 2016 | $135,000 | $70,000 | $70,000 | $1,570 | $276,570 |
| 2015 | $120,000 | $70,000 | $70,000 | $1,706 | $261,706 |

22. Defendant Arun Sarin ("Sarin") has been a Company director since 2009. Defendant Sarin was a member of the Company's Audit Committee from at least March 2015 to March 2016. Defendant Sarin has been a member of the Company's Risk Committee since March 2018. The Company paid defendant Sarin the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $135,000 | $129,007 | $86,018 | - | $350,025 |
| 2021 | $125,000 | $111,000 | $74,000 | - | $310,000 |
| 2020 | $125,000 | $111,000 | $74,000 | - | $310,000 |
| 2019 | $125,000 | $80,000 | $80,000 | - | $285,000 |
| 2018 | $125,000 | $80,000 | $80,000 | - | $285,000 |
| 2017 | $125,000 | $70,000 | $70,000 | $1,640 | $266,640 |
| 2016 | $125,000 | $70,000 | $70,000 | $1,570 | $266,570 |
| 2015 | $115,000 | $70,000 | $70,000 | $1,706 | $256,706 |

23. Defendant Paula A. Sneed ("Sneed") has been a Company director since April 2002. The Company paid defendant Sneed the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $150,000 | $129,007 | $86,018 | - | $365,025 |
| 2021 | $130,000 | $111,000 | $74,000 | - | $315,000 |
| 2020 | $110,000 | $111,000 | $74,000 | - | $295,000 |
| 2019 | $110,000 | $80,000 | $80,000 | - | $270,000 |
| 2018 | $120,000 | $80,000 | $80,000 | - | $280,000 |
| 2017 | $120,000 | $70,000 | $70,000 | $1,640 | $261,640 |
| 2016 | $120,000 | $70,000 | $70,000 | $1,570 | $261,570 |
| 2015 | $110,000 | $70,000 | $70,000 | $1,706 | $251,706 |

24. Defendant Charles A. Ruffel ("Ruffel") has been a Company director since at least May 2018. Defendant Ruffel has been a CSB director since 2018. Defendant Ruffel was a Schwab Strategic Trust trustee from 2009 to 2018. Defendant Ruffel was a The Charles Schwab Family of Funds, Schwab Investments, Schwab Capital Trust and Schwab Annuity Portfolios, Laudus Trust, and Laudus Institutional Trust trustee from 2015 to 2018. The Company paid defendant Ruffel the following compensation:

| Fiscal Year | Cash | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | Total |
|---|---|---|---|---|---|
| 2022 | $35,000 | $120,000 | $129,007 | $86,018 | $370,025 |
| 2021 | $35,000 | $115,000 | $111,000 | $74,000 | $335,000 |
| 2020 | $92,500 | $57,500 | $111,000 | $74,000 | $335,000 |
| 2019 | $139,396 | $56,896 | $155,000 | $80,000 | $431,292 |
| 2018 | $72,684 | - | $46,667 | $46,667 | $166,018 |

25. Defendant Joan T. Dea ("Dea") has been a Company director since October 2017. Defendant Dea has been a CSB director since 2011. The Company has paid defendant Dea the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $165,000 | $129,007 | $86,018 | - | $380,025 |
| 2021 | $155,000 | $111,000 | $74,000 | - | $340,000 |
| 2020 | $155,000 | $111,000 | $74,000 | - | $340,000 |
| 2019 | $198,000 | $155,000 | $80,000 | - | $433,000 |
| 2018 | $198,000 | $155,000 | $80,000 | - | $433,000 |
| 2017 | $90,310 | $76,667 | $11,667 | $1,283 | $179,927 |

**Former Director Defendants**

26. Defendant C. Preston Butcher ("Butcher") was a Company director from October 1988 to May 2018. Defendant Butcher was a member of the Company's Audit Committee from at least March 2015 to March 2018. The Company paid defendant Butcher the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $62,500 | - | - | - | $62,500 |
| 2017 | $125,000 | $70,000 | $70,000 | $1,640 | $266,640 |
| 2016 | $125,000 | $70,000 | $70,000 | $1,570 | $266,570 |
| 2015 | $115,000 | $70,000 | $70,000 | $1,706 | $256,706 |

27. Defendant Stephen T. McLin ("McLin") was a Company director from July 1988 to May 2020. Defendant McLin was a CSB director from 1987 to 1998. Defendant McLin was a member of the Company's Risk Committee from at least March 2015 through March 2020. The Company paid defendant McLin the following compensation:

| Fiscal Year | Cash | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2020 | $17,500 | $57,500 | - | - | - | $75,000 |
| 2019 | $78,000 | $115,000 | $155,000 | $80,000 | - | $428,000 |
| 2018 | $78,000 | $125,000 | $155,000 | $80,000 | - | $438,000 |
| 2017 | $68,000 | $125,000 | $135,000 | $70,000 | $2,922 | $400,922 |
| 2016 | $66,000 | $125,000 | $135,000 | $70,000 | $2,521 | $398,521 |
| 2015 | $71,250 | $115,000 | $110,000 | $70,000 | $2,449 | $368,699 |

28. Defendant Roger O. Walther ("Walther") was a Company director from April 1989 to December 2020. The Company paid defendant Walther the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2020 | $130,000 | $111,000 | $74,000 | - | $315,000 |
| 2019 | $130,000 | $80,000 | $80,000 | - | $290,000 |
| 2018 | $140,000 | $80,000 | $80,000 | - | $300,000 |
| 2017 | $140,000 | $70,000 | $70,000 | $1,640 | $281,640 |
| 2016 | $140,000 | $70,000 | $70,000 | $1,570 | $281,570 |
| 2015 | $120,000 | $70,000 | $70,000 | $1,706 | $261,706 |

29. Defendant Robert N. Wilson ("Wilson") was a Company director from May 2003 to January 2019. Defendant Wilson was a member of the Company's Risk Committee from at least March 2015 through March 2018. The Company paid defendant Wilson the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2019 | $31,250 | - | - | - | $31,250 |
| 2018 | $135,000 | $80,000 | $80,000 | - | $295,000 |
| 2017 | $135,000 | $70,000 | $70,000 | $1,640 | $276,640 |
| 2016 | $135,000 | $70,000 | $70,000 | $1,570 | $276,570 |
| 2015 | $120,000 | $70,000 | $70,000 | $1,706 | $261,706 |

30. Defendant William S. Haraf ("Haraf") was a Company director from January 2015 to May 2023. Defendant Haraf has been a CSB director since 2015. Defendant Haraf was a member of the Company's Audit Committee from at least March 2015 to March 2023. He was a member of the Company's Risk Committee from at least March 2015 through March 2020. The Company paid defendant Haraf the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2022 | $155,000 | $129,007 | $86,018 | - | $370,025 |
| 2021 | $150,000 | $111,000 | $74,000 | - | $335,000 |
| 2020 | $165,000 | $111,000 | $74,000 | - | $350,000 |
| 2019 | $221,500 | $155,000 | $80,000 | - | $456,500 |
| 2018 | $230,000 | $155,000 | $80,000 | - | $465,000 |
| 2017 | $224,500 | $135,000 | $70,000 | $2,510 | $432,010 |
| 2016 | $218,000 | $135,000 | $70,000 | $1,406 | $424,406 |
| 2015 | $183,889 | $100,834 | $64,167 | $385 | $349,275 |

**<u>Current Non-Defendant Directors</u>**

31. Non-defendant Marianne C. Brown ("Brown") has been a Company director since August 2020. Non-defendant Brown has been a CSB director since 2011. The Company paid Non-defendant Brown the following compensation:

| Fiscal Year | Cash | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | Total |
|---|---|---|---|---|---|
| 2022 | $95,000 | $60,000 | $129,007 | $86,018 | $370,025 |
| 2021 | $130,598 | - | $111,000 | $74,000 | $315,598 |
| 2020 | $45,285 | - | $46,250 | $30,833 | $122,368 |

32. Non-defendant Brian M. Levitt ("Levitt") has been a Company director since October 2020. The Company paid Non-defendant Levitt the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2022 | $115,000 | $129,007 | $86,018 | $330,025 |
| 2021 | $110,000 | $111,000 | $74,000 | $295,000 |
| 2020 | $26,005 | $18,500 | $12,333 | $56,838 |

33. Non-defendant Gerri K. Martin-Flickinger ("Martin-Flickinger") has been a Company director since August 2020. Non-defendant Martin-Flickinger has been a member of the Company's Audit Committee since April 2021. The Company paid Non-defendant Martin-Flickinger the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2022 | $120,000 | $129,007 | $86,018 | $335,025 |
| 2021 | $115,000 | $111,000 | $74,000 | $300,000 |
| 2020 | $45,285 | $46,250 | $30,833 | $122,368 |

34. Non-defendant Bharat B. Masrani (Masrani") has been a Company director since October 2020. The Company paid Non-defendant Masrani the following compensation:

| Fiscal Year | Cash | Fees Earned or Paid in Cash Deferred into RSU's or Options | Stock Awards | Option Awards | Total |
|---|---|---|---|---|---|
| 2022 | - | $120,000 | $129,007 | $86,018 | $335,025 |
| 2021 | - | $115,000 | $111,000 | $74,000 | $300,000 |
| 2020 | $27,188 | - | $18,500 | $12,333 | $58,021 |

35. Non-defendant Todd M. Ricketts ("Ricketts") has been a Company director since October 2020. Non-defendant Ricketts has been a member of the Company's Audit Committee since April 2021. The Company paid Non-defendant Ricketts the following compensation:

| Fiscal Year | Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2022 | $120,000 | $129,007 | $86,018 | $335,025 |
| 2021 | $115,000 | $111,000 | $74,000 | $300,000 |
| 2020 | $26,535 | $18,500 | $12,333 | $57,368 |

36. Non-defendant Carrie Schwab-Pomerantz ("Schwab-Pomerantz") has been a Company director since October 2022. Non-defendant Schwab-Pomerantz has been Charles Schwab Foundation's President since 2002, and Chair of Charles Schwab Foundation since 2014. Non-defendant Schwab-Pomerantz has been Charles Schwab & Co., Inc.'s managing director of consumer education since April 2022, and was Senior Vice President of consumer education from 2005 to May 2022. Non-defendant Schwab-Pomerantz has been Schwab Charitable Fund's Chair since 2012. The Company paid Non-defendant Carrie Schwab-Pomerantz the following compensation:[1]

| Fiscal Year | All Other Compensation | Total |
|---|---|---|
| 2022 | $898,154 | $898,154 |

37. The defendants identified in ¶¶13-16 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-14, 17-30 are referred to herein as the "Director Defendants." The defendants identified in ¶¶17-19, 20, 22, 26, 30 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶17-18, 19, 22, 27, 29-30 are referred to herein as the "Risk Committee Defendants." Collectively, the defendants identified in ¶¶13-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

38. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Charles Schwab and its stockholders fiduciary obligations of care and loyalty, and were and are required to use their utmost ability to control and manage Charles Schwab in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Charles Schwab and not in furtherance of their personal interest or benefit.

39. To discharge their duties, the officers and directors of Charles Schwab were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the

[1] The amount shown for non-defendant Schwab-Pomerantz reflects compensation received in connection with her employment with CS & Co.

financial affairs of the Company. By virtue of such duties, the officers and directors of Charles Schwab were required to, among other things:

(a) ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all laws, rules, and regulations;

(b) ensure that the Company complied with its legal obligations and requirements and refrained from engaging in deceptive conduct;

(c) ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d) properly and accurately guide stockholders and analysts as to the true business practices, operations, financials, financial prospects, compliance policies, and internal controls of the Company at any given time, including making accurate statements about the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls;

(e) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(f) remain informed as to how Charles Schwab conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Corporate Governance Guidelines and Code of Ethics and Business Conduct**

40. Charles Schwab allegedly holds its fiduciaries to specific corporate principles. In particular, in the Company's Corporate Governance Guidelines, Charles Schwab describes the duties undertaken by the Company's Board of Directors (the "Board') and the active oversight role the Board

plays in the Company's business affairs. In particular, the Corporate Governance Guidelines state that the Board is responsible for:[2]

> ***Monitoring Operations***
>
> The CEO and Executive Council are accountable to the Board of Directors for the operation of the company. At and between Board meetings, management makes such presentations and reports and provides such information to the Board as necessary to keep the Board fully informed of significant activities and matters relating to the operation of the company.
>
> ***Strategy Development***
>
> ***Long-term strategic issues are discussed at regular Board meetings and, periodically, Board meetings are devoted exclusively to strategy issues***. The frequency of strategy meetings varies with changes in the business environment and the organization.
>
> ***Financial Performance***
>
> The Board reviews the business plan for the fiscal year. Financial performance (actual and in comparison to plan) is reviewed at regular Board meetings. ***The Board believes it is important to establish and evaluate long-term objectives and not to over-emphasize short-term performance.***
>
> ***Regulatory Oversight***
>
> ***The Board expects adherence to regulatory and legal mandates and the conduct of daily operations in a manner consistent with this expectation.*** The General Counsel advises directors of material legal and regulatory matters at regular meetings of the Board, Audit Committee, and Risk Committee.
>
> ***Risk Oversight***
>
> ***The Risk Committee approves risk appetite statements and key risk policies. The Chief Risk Officer advises the Board of Directors and its committees on risk management activities consistent with the company's risk appetite statements and strategic plan***.

41. The Individual Defendants, as officers and directors of Charles Schwab, were also bound by the Company's Code of Business Conduct and Ethics (the "Code"). The Code sets out basic principles to guide all directors, officers, and employees of Charles Schwab and its subsidiaries who are required to

---

[2] Plaintiff refers to the Corporate Governance Guidelines in place during the relevant period, dated January 29, 2015.

know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior. In particular, the Code provides:[3]

> The Charles Schwab Corporation is committed to the highest standards of ethical conduct. This Code of Business Conduct and Ethics ("Code") applies to your service as a director, officer or employee of The Charles Schwab Corporation and its subsidiaries and affiliates (the "company"). The Code outlines ethical conduct in several key areas:
>
> - Ethical behavior and legal compliance
> - Conflicts of interest
> - Confidentiality of information
> - Employment practices
> - Business practices
> - Compliance and reporting
>
> * * *
>
> **Ethical Behavior and Legal Compliance**
>
> The trust we earn from our clients and communities in which we operate depends on our reputation for integrity and obeying the law.
>
> **Ethical Behavior**
>
> Your decisions and behavior have far-reaching implications: reflecting on your individual credibility, the Schwab brand, and the financial services industry as a whole. A strong personal sense of ethics should always play a significant role in guiding you towards a proper course of action. Your conduct should reflect positively on the company.
>
> The appearance of impropriety can be as harmful to the company's reputation as improper conduct. If you have questions about whether certain actions are improper, or will reflect inappropriately on yourself or the company, you should seek guidance. Following instructions from a supervisor, ignoring improper conduct, or failing to seek guidance when in doubt will not relieve you of your responsibility to behave ethically.
>
> **Compliance with Laws, Rules, Regulations and Policies**
>
> The company's business is subject to various laws, rules and regulations, including securities, banking, and other federal, state and local laws. Although you are not expected to know the details of the myriad of laws governing our business, you are expected to be familiar with and comply with policies and procedures that apply to your business unit and complete any required training that applies to you (e.g., training regarding privacy or anti-

[3] Plaintiff refers to the Code in place during the relevant period, dated December 11, 2014.

money laundering). When in doubt about applicable laws or regulations, seek advice from supervisors, the Office of Corporate Counsel, the Compliance Department or other appropriate personnel.

* * *

**Conflicts of Interest**

You must not engage in outside business or other activities that would interfere with your independent exercise of good judgment in carrying out the business affairs of the company. A "conflict of interest" occurs when your private interest interferes in any way – or even appears to interfere – with the interests of the company. You have a duty to report any material transaction or relationship that reasonably could be expected to create a conflict of interest with the company. If you have any questions regarding what might constitute a conflict of interest, or to report any transaction or relationship that you believe has occurred or may occur that might constitute a conflict of interest, contact the Corporate Responsibility Officer or the Ombudsperson.

* * *

**Business Practices**

In our business operations, we deal fairly with our clients, colleagues and shareholders. We maintain accurate business records and comply with laws and regulations regarding financial disclosures and audits.

**Financial Disclosures**

The company is committed to providing full, fair, accurate, timely and understandable disclosure in reports and documents that the company files with, or submits to, the Securities and Exchange Commission and other regulatory agencies and in other public communications made by the company. You are required to comply with company policies and procedures for compiling such disclosures and ensuring that they are full, fair, accurate, timely and understandable. The company may from time to time receive inquiries regarding its financial disclosures from the investment community (i.e., equity analysts and representatives from securities and investment firms). The Investor Relations Department acts as a liaison between the company and the investment community and is responsible for responding to their inquiries. You should direct all inquiries from members of the investment community to the Investor Relations Department. If you have any questions regarding the company's disclosure obligations, please contact the Office of Corporate Counsel.

* * *

**Record-Keeping**

We require honest and accurate recording and reporting of information to maintain the integrity of our business records and to make responsible business decisions. The company's books, records and accounts must (i) accurately reflect all transactions of the company and all other events that are the subject of a specific regulatory record-keeping requirement; (ii) be maintained in reasonable detail; and (iii) conform both to applicable legal requirements and to the company's system of internal controls. Unrecorded or "off the books" funds or assets are prohibited unless permitted by applicable law or regulation. Business records must not contain exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies. This applies equally to e-mail, internal memoranda, formal reports, and all other forms of business records. You must be familiar with the company's record retention policies and always retain or destroy records according to them. In the event of litigation, governmental investigation or the threat of such action, you should consult the Office of Corporate Counsel regarding record retention.

* * *

**Additional Responsibilities**

*Role of Managers*

- Establish, communicate and promote compliance with business conduct standards personally and within your organization(s).
- Provide employees with information about standards, policies, procedures and rules.
- Address any behavior that indicates an employee may not understand or may not be complying with expectations.
- Answer employee questions about business conduct and seek advice from senior management, the Compliance Department, and other company departments as outlined in this Code when in doubt.
- Make certain that conduct that may be a violation of policies, regulations or rules is reported timely and appropriately.
- Make certain that decisions and actions aimed at addressing misconduct are free of discriminatory influence or favoritism.

*Role of Directors*

- Review the Code periodically and recommend any changes.
- Ensure that management establishes procedures for implementing the Code.
- Ensure that management carries out the operations of the company in accordance with the law and company policies.
- Ensure that management has established appropriate procedures for handling reports of misconduct.
- Review management's reports of compliance with the Code.

**Audit Committee Charter**

42. Under the Audit Committee Charter, the Audit Committee Defendants owed specific additional duties to Charles Schwab to assist the Board in overseeing the integrity of the Company's financial statements and SEC filings, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting, among other things. In particular, the Audit Committee Charter states:[4]

> Review and discuss with management and the independent auditors the company's annual and quarterly financial statements (and the results of the independent auditors' reviews of the quarterly financial statements), ***including reviewing specific disclosures made in management's discussion and analysis***.
>
> (a) Review and discuss with management and the independent auditors:
>
> - Significant financial reporting issues and judgments made in connection with the preparation of the company's financial statements, including any significant changes in the company's selection or application of accounting principles;
> - Management's internal control assessment and independent auditor attestation, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein, the adequacy of disclosures about changes in internal control over financial reporting, and any fraud involving management or other employees who have a significant role in the Company's internal controls (as well as any special steps adopted in light of such control issues);
> - Analyses of the effect of alternative assumptions, estimates or GAAP methods on the company's financial statements, and the treatment preferred by the independent auditors;
> - The effect of regulatory and accounting initiatives as well as off-balance sheet structures on the company's financial statements; and
> - ***Matters (including correspondence or inquiries from regulators or governmental agencies, complaints or legal matters) that raise material issues regarding the company's financial statements or accounting policies***.

* * *

[4] Plaintiff refers to the Audit Committee Charter in place during relevant times, dated December 9, 2015.

> Recommend to the Board whether the audited financial statements should be included in the company's Form 10-K.
>
> Periodically review with management the form of presentation and types of information to be included in the company's earnings releases, as well as the nature of and process for providing information to analysts and rating agencies.

43. Moreover, the Audit Committee Charter provides that the Audit Committee members must actively oversee risks and exposures related to legal and regulatory compliance. In particular, the Audit Committee Charter provides:

> Review reports from management and the Risk Committee concerning the company's risk assessment and risk management policies, the company's major risk exposures and the steps management has taken to monitor and control such exposures.
>
> Obtain and review reports from management, the General Counsel, and the Chief Compliance Officer regarding the policies and procedures for ensuring compliance with, and whether the company and its affiliated entities are in compliance with, applicable legal requirements, conflicts of interest policies, and the company's code of business conduct and ethics.
>
> * * *
>
> Review matters escalated by the Risk Committee and when appropriate, conduct a joint session with the Risk Committee to discuss any matters that may have a significant financial statement impact or require significant financial statement or regulatory disclosures or present other significant issues within the purview of the Audit Committee.

44. In carrying out these functions, the Audit Committee Charter provided that the Audit Committee shall "[r]eport activities of the Audit Committee to the full Board on a regular basis."

**Risk Committee Charter**

45. Under the Risk Committee Charter,[5] the Risk Committee Defendants owed specific additional duties to Charles Schwab to assist the Board in overseeing the Company's enterprise-wide risk management framework. The Risk Committee Charter provides that:

> The Risk Committee ("Committee") of the Board of Directors ("Board") assists the Board in fulfilling its oversight responsibilities with respect to the company's risk management

[5] Plaintiff refers to the Risk Committee Charter in place during the relevant period, dated January 29, 2015.

program, including: (i) the company's risk governance structure to identify, measure, monitor and mitigate risks, (ii) the performance and activities of the company's operational risk management organization; and (iii) key policies with respect to oversight of specific risks, including credit, operational, and capital and liquidity risk.

46. The Risk Committee Charter further provides that:

**RESPONSIBILITIES**

Responsibilities of the Committee include, but are not limited to, the following:

Risk Governance

1. Review and discuss with management the company's risk governance structure.
2. Review and approve the company's enterprise-wide risk management framework, including the strategies, policies, procedures, and systems established by management to identify, assess, measure, and manage the major risks facing the company.

3. Review and discuss management's assessment of the company's aggregate enterprise-wide risk profile and review and approve the company's risk appetite statement on an annual basis.

Oversight of Risk Management

4. Evaluate the scope of work of the Corporate Risk organization and its planned risk management activities.

5. Review the appointment, performance and replacement of the company's Chief Risk Officer.

Oversight of Risk Exposures

6. Review the company's capital, liquidity and funding, including regulatory capital ratios and internal capital adequacy process.

7. Review reports from management regarding asset quality and the effectiveness and administration of credit-related policies, and the adequacy of the allowance for credit losses.

8. Review the effectiveness of operational risk management policies and controls.

9. Review the company's information security risk management program, including cybersecurity risk.

10. Review reports from Corporate Risk, Legal, Compliance, and Internal Audit relating to risk issues and management's responses to such reports.

11. Review the Company's compliance with regulatory obligations arising under applicable laws, rules and regulations, including any terms and conditions required from time to time by any action, formal or informal, of any federal or state banking or securities regulatory agency or authority and any responses of management to any inquiries from any applicable regulator.

General Responsibilities

12. Report to the Audit Committee on the effectiveness of key risk policies and controls and the financial impact of control deficiencies.

13. Escalate to the Audit Committee for discussion at a joint session with the Audit Committee any items that may have significant financial statement impact or require significant financial statement/regulatory disclosures, and any other significant issues.

14. Report the Committee's activities and significant decisions to the Board.

15. Form and delegate authority to subcommittees when appropriate.

16. Review and reassess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

17. Conduct an annual performance evaluation of the Committee.

**Breaches of Duties**

47. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Charles Schwab, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware of posed a risk of serious injury to the Company.

48. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public and failing to implement adequate internal controls over legal and regulatory compliance. These improper practices wasted the Company's assets and caused Charles Schwab to incur substantial damage.

49. The Individual Defendants, because of their positions of control and authority as officers or directors of Charles Schwab, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has

already incurred, Charles Schwab has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted or assisted each other in breaching their respective duties.

51. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Charles Schwab, regarding the Individual Defendants' management of Charles Schwab's operations and compliance with the law; and (ii) enhance the Individual Defendants' executive and directorial positions at Charles Schwab and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the hidden fees in the SIP.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company to purposefully engage in repeated violations of law and release improper statements to the public. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary

wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CHARLES SCHWAB AND THE INVESTMENT ADVISOR INDUSTRY

55. Charles Schwab operates through its subsidiaries. The key subsidiaries in this action are Charles Schwab Investment Advisory, Inc., Schwab Wealth Investment Advisory, Inc., Schwab Bank, and Charles Schwab & Co., Inc. ("CS & Co."),[6] a California corporation headquartered in San Francisco, California. CS & Co. is dually registered with the Commission as an investment adviser and broker dealer. CS & Co. sponsors several wrap fee programs, including ones where an affiliate is the investment adviser to retail and high-net-worth investors.

56. Charles Schwab Investment Advisory, Inc. ("CSIA") is a Delaware corporation headquartered in San Francisco, California. It is registered with the Commission as an investment adviser and is a subsidiary of Schwab Holdings, Inc. ("Schwab Holdings"), a wholly-owned subsidiary of the Company. As of March 31, 2021, CSIA had approximately $53.7 billion in regulatory assets under management.

57. Schwab Wealth Investment Advisory, Inc. ("SWIA") was a Delaware corporation headquartered in San Francisco, California. It was formed in order to be an investment adviser for the SIP product, and was registered with the Commission as an investment adviser until its registration was terminated in March 2018. SWIA was a subsidiary of Schwab Holdings.

58. Schwab Bank was a federal savings association headquartered in Henderson, Nevada until 2020, when it converted to a Texas-chartered savings bank headquartered in Westlake, Texas. It is a wholly-owned subsidiary of the Company.

59. Investment advisors and planners like Charles Schwab can be compensated by earning fees, commissions, or through a hybrid of the two. A fee-only investment advisor is paid a set rate for the services they provide rather than getting paid by commission on the products they sell or trade. One way fee-only investment advisors are compensated is by charging customers a percentage based on assets under

---

[6] CS & Co.'s latest Form ADV dated May 23, 2023 lists defendants Martinetto and Crawford, among others, as managing directors.

management ("AUM"). Investment advisors can also charge a "wrap fee." A wrap fee is an all-inclusive charge for the services of an investment advisor and generally covers advice, research, brokerage services, and administrative fees. Wrap fees generally range from 1% to 3% per year of AUM.

**Charles Schwab Faced Increasing Pressure to Grow Its AUM by Advertising No Fees**

60. In 2013, Robinhood disrupted the brokerage industry by offering stock trading for free. Analysts predicted that it was only a matter of time before all major brokerages were forced to go to zero after Robinhood offered free trades. These predictions have largely come true. For example, by October 2019, the Company slashed its online trading commissions for U.S. stocks, Exchange Traded Funds ("ETFs"), and options from the previous $4.95 to zero, although trading options continued to cost $0.65 per contract. Charles Schwab's announcement came shortly after Interactive Brokers Group, Inc. ("Interactive Brokers") took the same step toward commission-free trades, J.P. Morgan Chase unveiled its own free trading app, and Vanguard Group's announcement that investors using its online brokerage platform could trade all ETFs on a commission-free basis.

61. At the time they caused the Company to issue the misleading statements detailed herein, the Individual Defendants could see the writing on the wall. The Company's fiduciaries knew that Robinhood was disrupting the brokerage industry and that the Company needed to grow its AUM if it wanted to stay competitive. To do so, Charles Schwab developed programs like SIP, which it could advertise as having "no fees." This promise of "no fees" was a key selling point for SIP in a space where barriers to entry were becoming increasingly outmoded by Robin Hood's free-to-use brokerage model. In doing so, however, the Individual Defendants misled the public regarding the hidden fees associated with—and Charles Schwab's conflict of interest in—SIP, both of which stemmed from the Company's decision to allocate a high, preset amount of SIP customer portfolios to cash in order to meet its revenue targets at the expense of SIP customers' returns.

## CHARLES SCHWAB ALTERS ITS TRUTHFUL PUBLIC DISCLOSURES IN RESPONSE TO MARKET CRITICISM OF SIP

62. The SEC's Investment Adviser Public Disclosure website contains the registration or reporting form ("Form ADV") that an adviser filed. Investment advisers file Form ADV to register with

the SEC and the states. Some advisers that do not have to register with the SEC or the states must nonetheless complete some of the questions in Form ADV for purposes of reporting to the SEC and the states. Form ADV contains information about an investment adviser and its business operations. Additionally, it contains disclosure about certain disciplinary events involving the adviser and its key personnel.

63. Form ADV Part 2 ("ADV brochure") serves as a brochure for the firm. It provides key information about the Company, including its business practices, fees, and conflicts of interest. Part 2A is the brochure's cover page.

64. Initially, SWIA's ADV brochure, which was published months before SIP launched, truthfully described the effect of high cash allocations in a customer's account. The ADV brochure stated that there was a conflict of interest between Charles Schwab and SIP customers in setting the cash allocations; that this conflict resulted in higher cash allocations, which could negatively impact performance in a rising market; and that the cash allocations were higher than other services because clients did not pay a fee to use SIP.

65. Analysts negatively viewed Charles Schwab's new product. On February 18, 2015, weeks before the SIP launch, Raymond James & Associates ("Raymond James") published a report that was critical of SIP, claiming that the drag from the high cash allocations was a hefty cost of the program. In particular, Raymond James reported:

> **Conclusion:** We now understand why Charles Schwab is so excited about the upcoming launch of Schwab Intelligent Portfolios (SIP), the firm's "robo-advisor" offering that is slated to launch at some point in 1Q15: ***SIP will allocate between 7% and 30% of client portfolios to cash. By holding such a large percentage of managed account assets in cash that can be swept to its bank, Schwab stands ready to generate substantial revenue from the product despite not charging any advisory fees. From the client's perspective, however, the potential performance drag from such a high cash allocation may easily exceed the management fee savings relative to competitors.***
>
> **Two revenue streams from Schwab Intelligent Portfolios (SIP):** Although the product itself is free (no advisory fee, no commissions, no service fees), ***SIP will generate revenue for Schwab in two ways.*** First, some portion of client portfolios may be invested in Schwab ETFs, from which Schwab will earn management fees. ***Second, Schwab will sweep the cash allocation of client managed accounts into Schwab Bank and earn a net interest***

> ***margin on this cash. We believe the second revenue source is likely to be much greater than the first and Schwab's regulatory filings indicate the same.***

66. On February 18, 2015, RIABiz published an article titled "Schwab tells the SEC its robo-advisor has a 30 basis-point fee and big-time cash allocations held by Schwab bank." According to the article, the ADV brochure disclosed that SIP will allocate as much as 30% of clients' assets to Schwab Bank. Since Schwab Bank earns income on the sweep allocations, there is a conflict of interest between Schwab Bank and investors. RIABiz reiterated the ADV brochure when describing the profits earned from SIP: "'[a] significant portion of the revenue contributed to the Schwab entities from the program will result from the profit earned by Schwab Bank in offering the deposit accounts.'" RIABiz described the Company's cash allocation strategy as a revenue weapon akin to a "howitzer."

67. In reaction to these articles, Charles Schwab management directed that the SWIA ADV brochure be re-written, and that a public relations campaign be launched to explain the SIP cash allocations. The new ADV brochure and press materials were prepared in two days. These materials are discussed in detail below.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MISLEADING STATEMENTS CONCEALING THE EFFECT OF SIP CASH ALLOCATIONS AND CHARLES SCHWAB'S CONFLICT OF INTEREST WITH SIP CUSTOMERS**

68. The Company launched SIP on March 9, 2015. As discussed above, SIP is a "robo-adviser"— an investment adviser that purports to provide automated, software-based investment portfolio management to clients. SWIA sponsored SIP, and CSIA managed the SIP portfolios; both acted as investment advisers to SIP customers. The Company differentiated itself from competing robo-advisers by claiming that it did not charge any fees to the client and that the makeup of SIP portfolios were determined through a "disciplined portfolio construction methodology."

69. This was not the case. Rather, each SIP model portfolio held between 6% and 29.4% of clients' assets in cash. The Company preset the amount of cash that each SIP model portfolio contained so that the Company's bank affiliate, Schwab Bank, would earn at least a minimum amount of revenue from the spread on the cash by loaning out the money. Effectively, Charles Schwab constructed the

portfolios so that the Company would still receive the same amount from clients as if the Company charged them an advisory fee. Likewise, under normal market conditions where equities out-performed cash, clients' portfolios would have lower return by approximately the same amount as the Company would have charged for an advisory fee due to the high cash component of the portfolios. This "cash drag" thus operated as a hidden fee for SIP clients. Thus, Charles Schwab's incentive to maximize revenue by setting high cash allocations in SIP portfolios was directly at odds with SIP customers' desire to optimize returns, creating an actual conflict of interest between the Company and SIP clients.

70. From March 2015 through November 2018, the Individual Defendants caused or allowed the Company to make materially false and misleading statements concerning the cash drag effects associated with SIP cash and the Company's conflict of interest with SIP customers. Specifically, the Company failed to disclose that: (i) there were hidden fees in SIP in the form of pre-set cash allocations which created a "cash-drag" that lowered investors' returns while generating revenue for Charles Schwab; and (ii) there was an actual conflict of interest in setting the cash allocation amounts.

71. On February 20, 2015, SWIA changed the disclosures described above and published a revised version of its ADV brochure, and five days later, on February 25, 2015, CSIA followed suit. Both ADV brochures contained similar misleading statements regarding the cash allocations. While the ADV brochures disclosed that Schwab Bank earned income from the cash allocation for each investment strategy, SWIA's and CSIA's ADV brochures stated that the cash allocations in the SIP portfolios were based "on a disciplined portfolio construction methodology designed to balance performance with risk management appropriate for a client's goal, investing time frame, and personal risk tolerance, just as with other Schwab managed products." This was false and misleading because the cash allocations were pre-set in order to reach minimum revenue targets for the Company. Based on these revenue targets, Charles Schwab management set the percentages of cash that each of the model portfolios should contain, and the portfolio construction team then applied its methodologies to create the rest of the portfolio, using the cash allocations as a constraint.

72. Specifically, the February 20, 2015 SWIA ADV brochure stated the following:

***Potential* Conflicts of Interest and How They are Addressed**

SWIA, not Schwab Bank, sets the parameters for the Sweep Allocation in each investment strategy. They are ***set based on a disciplined portfolio construction methodology designed to balance performance with risk management appropriate for a clients' goal, investing time frame, and personal risk tolerance, just as with other Schwab managed products.*** Schwab Bank earns income on the Sweep Allocation for each investment strategy. The higher the Sweep Allocation and the lower the interest rate paid the more Schwab Bank earns, thereby creating a potential conflict of interest. ***The cash allocation can affect both the risk profile and performance of a portfolio. To mitigate any potential conflict, SWIA instructs CSIA to construct the Program strategies pursuant to modern portfolio theory, which seeks to construct an optimal return goal for a portfolio based on the level of risk an investor is willing to take***.

73. The above statements concerning "disciplined portfolio construction methodology" were materially misleading because the cash allocations were actually pre-set in order to reach minimum revenue targets. The Order revealed that "Schwab management set the percentages of cash that each of the model portfolios should contain," then the portfolio construction team applied its methodologies to create the rest of the portfolio, using the cash allocations as a constraint.

74. The above statements concerning how the cash allocation can affect both the risk profile and performance of a portfolio were misleading because, as the Order would later reveal, "Schwab's internal analyses" showed that the cash allocations would in fact lower the returns of the portfolios when other assets such as equities outperform cash.

75. The above statements concerning any "potential conflict" were misleading because there was an actual, not just potential, conflict of interest between the investors and the Company regarding the size of the cash allocations in the portfolios.

76. During March 2015, CS & Co. published advertisements stating that there were "no hidden fees [and] no advisory fees" for SIP. These statements were materially false and misleading because, as later revealed by the Order, the cash allocations in SIP would, when other assets such as equities outperform cash, reduce investors' returns by as much as advisory fees would have, which operated as a hidden fee.

**THE INDIVIDUAL DEFENDANTS KNEW THAT THE COMPANY'S REVISED PUBLIC DISCLOSURES AND MARKETING FOR SIP VIOLATED THE LAW**

77. The 220 Documents reveal that the Individual Defendants were routinely apprised of key details related to SIP, including the cash drag effect on SIP customer portfolios, the fact that cash allocations were preset based on Company revenue targets, and Charles Schwab's actual conflict of interest with SIP customers created by this dynamic. Despite this knowledge, however, the Individual Defendants approved and allowed the Company to issue the misleading statements identified above.

78. Further, the Individual Defendants knew of the Advisers Act. Rule 206 under the Advisers Act was part of a significant overhaul of the SEC's regulations in connection with the highly-publicized Dodd-Frank Act in 2010. The Individual Defendants knew that the Company's business model advertising SIP as having "no fees" and misleading investors into believing that SIP allowed them to keep more of their money than other advisory services that charged an advisory fee were violations of the Advisers Act. Since at least the July 23, 2015, Board meeting, where management told them as much, defendants Schwab, Bettinger, Martinetto, Adams, Dodds, Ellis, Goldfarb, Herringer, Sarin, Sneed, Butcher, McLin, Walther, Wilson, and Haraf knew that CSIA and SWIA were regulated by the SEC under the Advisers Act. CSC-REYNOLDS-002079, 2082.

**The Board Discusses the Effect of SIP Cash Allocations, SIP Portfolio Construction Methodology, and Planned Advertising for SIP Prior to Launch**

79. On December 10, 2014, defendants Goldfarb, Butcher, and Sarin, Bettinger, Dodds, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027786. These defendants met and learned that the SIP program faced significant operational, compliance, reputational, and fiduciary risks. CSC-REYNOLDS-009489. These defendants also learned that the investment community thought the robo-advisory program was "confusing and raised a lot of questions." CSC-REYNOLDS-009587.

80. On December 11, 2014, defendants Schwab, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Herringer, McLin, Sarin, Sneed, Walther, Wilson, and Martinetto held a Board meeting. CSC-REYNOLDS-027416. They discussed how SIP was a "key" 2015 initiative. CSC-REYNOLDS-000117. The Board was informed that advisor services' expenses were "worse" than what the Company had

planned for, a fact driven primarily by "project spend relating to … [SIP] program." CSC-REYNOLDS-000025.

81. On January 15, 2015, defendants Goldfarb, Butcher, and Sarin, Bettinger, Dodds, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027807. The Audit Committee met to discuss a January 16, 2015 press release for SIP. CSC-REYNOLDS-009353. The Audit Committee approved the press release's description of the SIP program: "a new automated investment advisory service that will provide sophisticated, ***diversified portfolios with no advisory fees, commissions or account service fees charged***." CSC-REYNOLDS-009354.

82. On January 29, 2015, defendants Schwab, Adams, Bettinger, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, and Martinetto discussed the SIP program. CSC-REYNOLDS-002767-2786. The Board specifically asked Naureen Hassan, Executive Vice President—Investor Services Strategy, Segments and Platforms, questions regarding SIP's "cash component in a portfolio and its variability" as well as revenue assumptions for SIP and the methodology for rebalancing portfolios. CSC-REYNOLDS-002786. The minutes did not explain what the specific questions regarding the cash component or Ms. Hassasn's answers were. However, during the same meeting, Ms. Hassan responded to questions from the Board regarding "competitive offerings and planned publicity with respect to SIP." *Id*. The Board and Accordingly, there is a reasonable inference that Ms. Hassan's discussions regarding the cash component, competitive offerings, methodology for investing, SIP revenue assumptions, and SIP publicity effectively notified the Board of the Company's SIP strategy, including cash drag on SIP clients' accounts and the plan to advertise SIP as a "no fee" service.

83. Accompanying Board materials reviewed during the meeting included a 2014 CEO self-assessment by defendant Bettinger. CSC-REYNOLDS-000326. Defendant Bettinger's self-assessment described the SIP program as a "diversified portfolio with no advisory fees." *Id*. The Board materials also included a SIP presentation. CSC-REYNOLDS-000498. The presentation stated that the SIP program charges "no program management fees, advice fees or commissions." CSC-REYNOLDS-000499-0507. The presentation reiterated that there were no advisory or trading fees. CSC-REYNOLDS-000505. However, the presentation stated that there were two types of account offering for SIP and both

accounts had a "5% cash minimum." CSC-REYNOLDS000501. The presentation revealed the timeline for SIP's full launch in February and the advertising campaign that started in October 2014. CSC-REYNOLDS-000507. Later during the Board meeting, David Garfield, Executive Vice President, General Counsel and Corporate Secretary, informed the Board about the SIP program's goals and accomplishments. CSC-REYNOLDS-000590. Therefore, the Board was well informed of SIP's cash drag, the plan to advertise as SIP having no fees, and of SIP's portfolio construction methodology.

84. Also on January 29, 2015, the Company launched an Employee Pilot SIP program. CSC-REYNOLDS-000507. Therefore, the Individual Defendants also knew about the cash drag effects on the Employee Pilot program.

85. On February 23, 2015, defendants Goldfarb, Adams, Butcher, Haraf, Sarin, Bettinger, Dodds, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027809. The Audit Committee met and discussed, among other things, mitigations for risks to the SIP program. CSC-REYNOLDS-010112. This was one of many meetings the Audit Committee had where they discussed SIP and were regularly informed of the SIP program. During this meeting, the Audit Committee reviewed "Go/No Considerations" including "Marketing and communications plans approved as complete for launch." *Id*. Thus, the Audit Committee, from before the SIP program launched, was heavily involved in overseeing the SIP program.

**The Board Discusses the Relationship Between SIP Cash Allocations and Company Revenue Targets and Approves Misleading Descriptions of SIP Post-Launch**

86. The Company launched SIP on March 9, 2015. On March 10, 2015, defendants Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, and Martinetto participated in a Board meeting to discuss, among other things, the launch of the SIP program, publicity of SIP program, and metrics regarding key initiatives for SIP. CSC-REYNOLDS-002802, 2809. Also during the meeting, defendant Martinetto answered questions from the Board regarding "earnings from [SIP]." CSC-REYNOLDS-002805-2806. An accompanying presentation informed the Board that

if interest rates rose, "Schwab's investments in the business" would be "accelerated."[7] CSC-REYNOLDS-000839.

87. After the launch of SIP, management continued to update the Board on SIP, including how management was going to grow the SIP program. CSC-REYNOLDS-001494. In fact, during the March 10, 2015, Board meeting, management and the Board discussed "marketing for [SIP]." CSC-REYNOLDS-001496. Accompanying materials for the meeting informed the Board of the SIP marketing campaign. CSC-REYNOLDS-001500. This included the public relations activities such as press releases, a conference call with media and influencers, interviews, and a "New York media tour." *Id*. The same slide detailed the advertising mediums for SIP—email, mobile, Company website, television, newspapers, billboards, and "Pop-up lounges" in San Francisco and New York City. *Id*. Thus, the Board was abreast of advertising for the SIP program.

88. On April 14, 2015, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027816. The Audit Committee met to discuss a news release for April 15, 2015. CSC-REYNOLDS-010164. The Audit Committeee approved the news release which contained a quote from defendant Bettinger: "We launched [SIP] … using sophisticated computer algorithms to build, monitor, and ***rebalance diversified portfolios*** based on an investor's stated goals, time horizon and risk tolerance … ***without charging any advisory fees***, commissions, or account service fees." CSC-REYNOLDS-010164-10165. The press release repeated that SIP "charges no advisory fees, commissions, or account service fees." CSC-REYNOLDS-010166.

89. On April 20, 2015, defendants Dodds, Adams, and Haraf held a meeting to discuss, among other things, SIP. CSC-REYNOLDS-018703, 8706. The Risk Committee asked questions regarding "the cash portion held in SIP accounts." CSC-REYNOLDS-018706. The heavily redacted minutes do not

---

[7] This is important because the Company profited by sweeping cash to Schwab Bank, loaning the money and pocketing the difference between the loan interest it received and the cash interest it paid to SIP clients. Since cash yields higher returns when interest rates are rising and Schwab Bank was using SIP cash allocations to make loans, cash would explain how Schwab's investments would accelerate if interest rates rose.

include what those questions or answers were. *Id*. There is a reasonable inference that the Risk Committee members were asking about the cash drag effects of the minimum cash allocations, as well as the revenues these cash holdings would generate for Charles Schwab.

90. On April 22, 2015, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Bettinger, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027819. The Audit Committee met and discussed, among other things, internal audit plans. CSC-REYNOLDS-010250. Accompanying presentation materials informed the Audit Committee that the SIP "RoboAdvisor" had a "high" residual risk rating. *Id*. Thus, the Audit Committee was aware of the risks associated with SIP.

91. On the same day, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Dea, and Martinetto met during a Board meeting to discuss, among other things, the SIP program. CSC-REYNOLDS-002811-2817. Defendant Martinetto responded to questions from the Board regarding "revenues from [SIP]." CSC-REYNOLDS-002813. Accompanying presentation materials from Paul Woolway, President of Schwab Bank, listed a 2015 objective to "Launch Schwab Bank Savings Sweep as part of [SIP]."[8] CSC-REYNOLDS-001804.

92. On May 13, 2015, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027450. They met to discuss, among other things, the definition of SIP. CSC-REYNOLDS-001883. Accompanying presentation materials defined SIP as "[a]n advisory program sponsored by Schwab Wealth Investment Advisory, Inc. The program offers clients investment strategies that consist of diversified portfolios of ETFs in a single account that is managed on a discretionary basis. It is an automated investment advisory service with ***no advisory fees,*** commissions or account service fees charged." *Id*. Accompanying presentation materials informed the Board that the "no fee" scheme was working: "Assets in [SIP] were $1.7 billion as of month-end April." CSC-REYNOLDS-001890.

---

[8] Schwab Bank Savings Sweep is the SIP feature that "sweeps" cash into Schwab Bank.

**<u>The Board Continues to Discuss Revenues and Fees Associated with SIP Cash Allocations While Approving Misleading Statements Implying that SIP Generated No Revenue and Had No Fees</u>**

93. On July 15, 2015, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, and Martinetto met during an Audit Committee meeting to discuss "results from the launch of [SIP]." CSC-REYNOLDS-011281-11282. The minutes reveal that these defendants reviewed the second quarter 2015 earnings release. CSC-REYNOLDS-011282. Accompanying presentation materials stated that the Audit Committee reviewed the second quarter 2015 earnings release dated July 16, 2015. CSC-REYNOLDS-010452. The materials revealed that the Audit Committee approved the description of revenue and fees for SIP. CSC-REYNOLDS-010458. The earnings release published on July 16, 2015, listed "Intelligent Portfolios" under advice solutions in a chart detailing the Company's "Asset Management and Administration Fees." The chart implied that the Company was not charging fees for or generating revenue from "Intelligent Portfolios" as it marked those areas with dashes as shown below:

| | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 157,418 | $ 230 | 0.59% |
| Fee waivers | | (168) | |
| Schwab money market funds | 157,418 | 62 | 0.16% |
| Schwab equity and bond funds [1] | 103,986 | 56 | 0.22% |
| Mutual Fund OneSource ® [2] | 245,694 | 200 | 0.33% |
| Total mutual funds [3] | $ 507,098 | 318 | 0.25% |
| Advice solutions [3]: | | | |
| Fee-based | $ 174,657 | 228 | 0.52% |
| Intelligent Portfolios | 2,159 | - | - |
| Legacy Non-Fee | 16,783 | N/A | N/A |
| Total advice solutions | $ 193,599 | 228 | 0.47% |

94. On July 23, 2015, at 8:00 a.m. in California, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027826. The minutes of the meeting indicated that the Audit Committee was informed of "various legal and regulatory issues." CSC-REYNOLDS-027829. The Audit Committee met to discuss, among other

things, internal audit plans. CSC-REYNOLDS-010511. The internal audit plan stated that although SIP had a "high" "residual risk," the internal audit plan for SIP had "not started." *Id*.

95. On July 23, 2015, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, and Martinetto met during a Board meeting to discuss revenues from SIP. CSC-REYNOLDS-002821. During the meeting, defendant Bettinger responded to questions from the Board regarding SIP and revenues from SIP. CSC-REYNOLDS-002818, 2821. Accompanying presentation materials include numerous references to SIP, but the heavily redacted minutes only contain one sentence referencing SIP. CSC-REYNOLDS-001946, 1983, 2002, 2011, 2034, 2037-2038, 2070, 2078-2079, 2082, 2159, 2165, 2175, 2247, 2250, 2254, 2264-2266, 2270, 2272, 2275-2276, 2291. The defendants were informed that part of the Company's competitive strategies included "the launch of SIP which doesn't charge advisory fees, commissions, or account service fees for automated investment advisory services vs. competitors." CSC-REYNOLDS-002159. The presentation also included a mid-year accomplishment reported by defendant Martinetto that the Company had completed "financial modeling for [SIP]." CSC-REYNOLDS-002270. Additionally, the defendants were informed that the Company had "successfully launched Schwab Bank Savings Sweep as part of [SIP]." CSC-REYNOLDS-002291. The vague minutes and the amount of times the concurring presentations mention SIP create a reasonable inference that the defendants were briefed extensively on the SIP business model, including revenues derived from the cash allocations.

96. On August 6, 2015, defendants Goldfarb, Adams, Dodds, Haraf, Sarin, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027830. The Audit Committee met to review a draft Quarterly Report on Form 10-Q for the second quarter 2015. CSC-REYNOLDS-010671. The fees and revenue from SIP in the draft Form 10-Q were redacted. CSC-REYNOLDS-010682. The Company filed its Form 10-Q for the second quarter 2015 on August 6, 2015. The Form 10-Q implied that SIP had not charged any fees or generated any revenue because there were dashes in place of where a dollar figure would appear:

| Three Months Ended June 30, | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 157,418 | $ 230 | 0.59% |
| Fee waivers | | (168) | |
| Schwab money market funds | 157,418 | 62 | 0.16% |
| Schwab equity and bond funds (1) | 103,986 | 56 | 0.22% |
| Mutual Fund OneSource ® (2) | 245,694 | 200 | 0.33% |
| Total mutual funds (3) | $ 507,098 | 318 | 0.25% |
| Advice solutions (3): | | | |
| Fee-based | $ 174,657 | 228 | 0.52% |
| Intelligent Portfolios | 2,159 | - | - |
| Legacy Non-Fee | 16,783 | N/A | N/A |
| Total advice solutions | $ 193,599 | 228 | 0.47% |
| Other (2,4) | | 124 | |
| Total asset management and administration fees | | $ 670 | |

97. On October 14, 2015, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027833. The Audit Committee approved a news release for October 15, 2015, titled "SCHWAB REPORTS RECORD THIRD QUARTER REVENUE OF $1.6 BILLION." CSC-REYNOLDS-010744. The fees and revenue from SIP in the press release were redacted. CSC-REYNOLDS-010751. The Company filed the press release on October 15, 2015. The press release implied that SIP had not charged any fees or generated any revenue because there were dashes in place of where a dollar figure would appear:

| Three Months Ended September 30, | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 160,266 | $ 237 | 0.59% |
| Fee waivers | | (166) | |
| Schwab money market funds | 160,266 | 71 | 0.18% |
| Schwab equity and bond funds (1) | 102,898 | 55 | 0.21% |
| Mutual Fund OneSource ® (2) | 230,235 | 188 | 0.32% |
| Total mutual funds (3) | $ 493,399 | 314 | 0.25% |
| Advice solutions (3): | | | |
| Fee-based | $ 170,211 | 225 | 0.52% |
| Intelligent Portfolios | 3,714 | - | - |
| Legacy Non-Fee | 16,372 | N/A | N/A |
| Total advice solutions | $ 190,297 | 225 | 0.47% |
| Other (2,4) | | 124 | |
| Total asset management and administration fees | | $ 663 | |

98. On October 21, 2015, defendants Dodds, Adams, Ellis, Haraf, McLin, Wilson, Bettinger, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028022. The Risk Committee met to discuss key revenue drivers. CSC-REYNOLDS-018447. The accompanying presentation materials listed SIP cash balances as "Asset Management Fees" and "Net Interest Income." *Id*. Therefore, the Risk Committee knew of an inconsistency between internal documents that listed SIP cash balances as fees and public disclosures that claimed SIP had no fee. Further, defendants Dodds, Adams, Ellis, Haraf, McLin, Wilson, Bettinger, and Martinetto were categorizing SIP cash balances as "key revenue drivers." *Id*.

99. On October 22, 2015, defendants Schwab, Adams, Bettinger, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027455. They met and discussed accomplishments for 2015, including the preparation of "all legal and risk mitigation measures, agreements, ***disclosures***, and online client experience … necessary to launch … SIP." CSC-REYNOLDS-002440.

100. On November 5, 2015, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027841. The Audit Committee met to review a draft Quarterly Report on Form 10-Q for the third quarter 2015. CSC-REYNOLDS-010986. The fees and revenue from SIP in the draft Form 10-Q were redacted. CSC-REYNOLDS-010998-10999. The Company filed its Form 10-Q for the third quarter 2015 on November 5, 2015. The Form 10-Q implied that SIP had not charged any fees or generated any revenue because there were dashes in place of where a dollar figure would appear:

| | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 160,266 | $ 237 | 0.59% |
| Fee waivers | | (166) | |
| Schwab money market funds | 160,266 | 71 | 0.18% |
| Schwab equity and bond funds [1] | 102,898 | 55 | 0.21% |
| Mutual Fund OneSource ®[2] | 230,235 | 188 | 0.32% |
| Total mutual funds [3] | $ 493,399 | 314 | 0.25% |
| Advice solutions [3]: | | | |
| Fee-based | $ 170,211 | 225 | 0.52% |
| Intelligent Portfolios | 3,714 | - | - |
| Legacy Non-Fee | 16,372 | N/A | N/A |
| Total advice solutions | $ 190,297 | 225 | 0.47% |
| Other [2,4] | | 124 | |
| **Total asset management and administration fees** | | **$ 663** | |

101. On December 9, 2015, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027466. They met and were informed that that the Company's Central Marketing department "[l]aunched innovative campaigns to support [SIP]." CSC-REYNOLDS-002710.

102. On January 15, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027870. The Audit Committee approved a news release for the Company's fourth quarter 2015 results. CSC-REYNOLDS-011284. The draft press release included a quote from defendant Bettinger that SIP contains "zero advisory, commission, or account service fees." CSC-REYNOLDS-011285. The fees and revenue from SIP in the draft press release were redacted. SCS-REYNOLDS-011291. The press release was filed the next day. The press release included Bettinger's quote and implied that SIP had not charged any fees or generated any revenue because there were dashes in place of where a dollar figure would be:

| | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 162,437 | $ 241 | 0.59% |
| Fee waivers | | (153) | |
| Schwab money market funds | 162,437 | 88 | 0.21% |
| Schwab equity and bond funds and ETFs | 105,935 | 54 | 0.20% |
| Mutual Fund OneSource ®(1) | 212,409 | 182 | 0.34% |
| Other third-party mutual funds and ETFs (1, 2) | 248,659 | 55 | 0.09% |
| Total mutual funds and ETFs (3) | $ 729,440 | 379 | 0.21% |
| Advice solutions (3): | | | |
| Fee-based | $ 171,577 | 225 | 0.52% |
| Intelligent Portfolios | 4,891 | - | - |
| Legacy Non-Fee | 16,135 | N/A | N/A |
| Total advice solutions | $ 192,603 | 225 | 0.46% |
| Other balance-based fees (2,4) | 328,982 | 57 | 0.07% |
| Other (2,5) | | 12 | |
| **Total asset management and administration fees** | | **$ 673** | |

103. On January 27, 2016, defendants Dodds, Adams, Ellis, Haraf, McLin, Wilson, Bettinger, Crawford, Schwab, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028033. The Risk Committee met and was informed of how assets from SIP were being invested. CSC-REYNOLDS-018910. For example, the Risk Committee was informed $12 million in SIP were put into bank loans. *Id*.

104. On January 28, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027493. The Board was informed that the Company's Central Marketing department "[d]eveloped comprehensive campaigns for key offerings including [SIP]." CSC-REYNOLDS-003025. Additionally, the accompanying presentations informed the Board that SIP had amassed $5.3 billion. CSC-REYNOLDS-003037.

105. On February 24, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027873. The Audit Committee approved the Company's Annual Report on Form 10-K for the year ended December 31, 2015. CSC-REYNOLDS-011340. The fees and revenue generated from SIP were redacted. CSC-REYNOLDS-011370. The Form 10-K was filed the same day. The Form 10-K implied that SIP had not

charged any fees or generated any revenue because there were dashes in place of where a dollar figure would be:

| Year Ended December 31, | 2015 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 161,381 | $ 947 | 0.59% |
| Fee waivers | | (672) | |
| Schwab money market funds | 161,381 | 275 | 0.17% |
| Schwab equity and bond funds and ETFs | 102,486 | 217 | 0.21% |
| Mutual Fund OneSource® (1) | 225,347 | 764 | 0.34% |
| Other third-party mutual funds and ETFs (1,2) | 251,491 | 223 | 0.09% |
| Total mutual funds and ETFs (3) | $ 740,705 | 1,479 | 0.20% |
| Advice solutions (3): | | | |
| Fee-based | $ 172,302 | 898 | 0.52% |
| Intelligent Portfolios | 3,274 | - | - |
| Legacy Non-Fee | 16,463 | N/A | N/A |
| Total advice solutions | $ 192,039 | 898 | 0.47% |
| Other balance-based fees (2,4) | 324,701 | 226 | 0.07% |
| Other (2,5) | | 47 | |
| Total asset management and administration fees | | $ 2,650 | |

106. On March 1, 2016, defendants Dodds, Adams, Ellis, Haraf, McLin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028048. Accompanying presentation materials informed the Risk Committee about "Assumptions for Product Balance Forecast." CSC-REYNOLDS-019338. A "key assumption" for the "SIP Bank Sweep" was that balances would "reach $1.1B by Dec. 2016, $1.4B by Dec. 2017, and $1.7B by Dec. 2018." *Id.* The rationale for these projections was that the Risk Committee should "assume 10% cash and 90% ETFs from incremental enrollments." *Id.* In other words, the Risk Committee should assume preset cash minimums.

107. On March 9, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-004635. The minutes reveal that the defendants discussed the "performance of [SIP] since its launch in March 2015" and asked questions regarding "assets under management in [SIP] compared to products offered by competitors." CSC-REYNOLDS-004643. The heavily redacted minutes do not indicate the specific questions or answers given regarding SIP's products compared to competitors. The accompanying presentation materials included "Key Revenue Drivers" which listed the "SIP Bank Sweep." CSC-REYNOLDS-003187. A "[k]ey [a]ssumption[]" for the "SIP Bank Sweep" was that

balances would "reach $1.1B by Dec. 2016, $1.4B by Dec. 2017, and $1.7B by Dec. 2018." CSC-REYNOLDS-003187. The rationale for these projections was that the Board should "assume 10% cash and 90% ETFs from incremental enrollments." *Id.* The presentation materials also included a baseline scenario income statement with net interest revenue that stated net interest revenue grow steadily "as balance sheet cash increases due to … sweep harmonization and SIP." CSC-REYNOLDS-003196.

108. On April 14, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027881. The Audit Committee approved a news release for April 15, 2016. CSC-REYNOLDS-011770. The fees and revenue generated from SIP were redacted from the draft news release. CSC-REYNOLDS-011777. The press release was filed April 15, 2016. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended March 31, 2016, because there were dashes in place of where a dollar figure would be:

| | 2016 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 168,440 | $ 246 | 0.59% |
| Fee waivers | | (97) | |
| Schwab money market funds | 168,440 | 149 | 0.36% |
| Schwab equity and bond funds and ETFs | 103,392 | 51 | 0.20% |
| Mutual Fund OneSource® | 194,644 | 164 | 0.34% |
| Other third-party mutual funds and ETFs (1) | 235,317 | 51 | 0.09% |
| Total mutual funds and ETFs (2) | $ 701,793 | 415 | 0.24% |
| Advice solutions (2): | | | |
| Fee-based | $ 166,419 | 215 | 0.52% |
| Intelligent Portfolios | 5,116 | - | - |
| Legacy Non-Fee | 16,469 | N/A | N/A |
| Total advice solutions | $ 188,004 | 215 | 0.46% |
| Other balance-based fees (3) | 318,027 | 56 | 0.07% |
| Other (4) | | 13 | |
| **Total asset management and administration fees** | | **$ 699** | |

109. On April 21, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027513. The Board discussed, among other things, the Company's net interest revenue. CSC-REYNOLDS-003525. The accompanying Board presentation included a supervisory baseline scenario income statement that stated net interest revenue grows steadily "as balance

sheet cash increases due to … changes in business initiatives (… SIP)…. The scenario's rapidly rising interest rates dramatically boost Net Interest Revenue growth." *Id.*

110. The Board was kept apprised of the success of the scheme, especially the competitive advantage the Company gained by misleading investors into believing that SIP had no fees and, as a result, investors believed they were keeping more of their money than if they went with another advisor that did charge a fee. On May 17, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027526. The Board reviewed a presentation that stated SIP "is viewed as an initial success and reinforces the significance of our scale as a sustainable competitive advantage." CSC-REYNOLDS-003728.

111. On July 15, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Haraf, Sarin, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027889. The Audit Committee approved a news release for July 18, 2016. CSC-REYNOLDS-012004. The fees and revenue generated from SIP were redacted from the draft news release. CSC-012011. The press release was filed July 18, 2016. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended June 30, 2016, because there were dashes in place of where a dollar figure would be:

| | 2016 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 163,929 | $ 239 | 0.59% |
| Fee waivers | | (55) | |
| Schwab money market funds | 163,929 | 184 | 0.45% |
| Schwab equity and bond funds and ETFs | 112,814 | 52 | 0.19% |
| Mutual Fund OneSource ® | 201,034 | 169 | 0.34% |
| Other third-party mutual funds and ETFs (1) | 252,405 | 56 | 0.09% |
| Total mutual funds and ETFs (2) | $ 730,182 | 461 | 0.25% |
| Advice solutions (2): | | | |
| Fee-based | $ 175,973 | 226 | 0.52% |
| Intelligent Portfolios | 6,620 | - | - |
| Legacy Non-Fee | 17,015 | N/A | N/A |
| Total advice solutions | $ 199,608 | 226 | 0.46% |
| Other balance-based fees (3) | 338,529 | 58 | 0.07% |
| Other (4) | | 12 | |
| **Total asset management and administration fees** | | **$ 757** | |

112. On July 20, 2016, defendants Dodds, Adams, Ellis, Haraf, McLin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028059. The Risk Committee met to discuss, among other things, product balances of net interest products. CSC-REYNOLDS-020005. "Intelligent Portfolio Cash" was listed as a net interest product "related to Net Interest Revenue." *Id.*

113. On July 21, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027534. The Board met to discuss preliminary second quarter 2016 financial results. CSC-REYNOLDS-003804. Accompanying presentation materials indicate that the Board was apprised of ongoing efforts to "educat[e]" the public about SIP through blog posts and live appearances. CSC-REYNOLDS-004182.

114. On October 14, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027896. The Audit Committee approved a news release for October 17, 2016. CSC-REYNOLDS-012316. The proposed press release included a quote from defendant Bettinger stating that SIP had "no advisory fee charged." CSC-REYNOLDS-012317. Fees and revenue generated from SIP were redacted from the proposed press release. CSC-REYNOLDS-012323. The press release was filed October 17, 2016. The press release included defendant Bettinger's statement that SIP had "no advisory fee" and further implied that SIP had not charged any fees or generated any revenue for the three months ended September 30, 2016, because there were dashes in place of where a dollar figure would be:

| | 2016 | | | | |
|---|---|---|---|---|---|
| | | Average Client Assets | | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ | 161,904 | $ | 239 | 0.59% |
| Fee waivers | | | | (41) | |
| Schwab money market funds | | 161,904 | | 198 | 0.49% |
| Schwab equity and bond funds and ETFs | | 121,378 | | 57 | 0.19% |
| Mutual Fund OneSource ® | | 203,589 | | 175 | 0.34% |
| Other third-party mutual funds and ETFs (1) | | 263,995 | | 56 | 0.08% |
| Total mutual funds and ETFs (2) | $ | 750,866 | | 486 | 0.26% |
| Advice solutions (2): | | | | | |
| Fee-based | $ | 183,191 | | 237 | 0.51% |
| Intelligent Portfolios | | 8,249 | | - | - |
| Legacy Non-Fee | | 17,232 | | - | - |
| Total advice solutions | $ | 208,672 | | 237 | 0.45% |
| Other balance-based fees (3) | | 350,117 | | 62 | 0.07% |
| Other (4) | | | | 13 | |
| **Total asset management and administration fees** | | | $ | **798** | |

115. On October 19, 2016, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028069. The Risk Committee met to discuss the "assumptions, weaknesses, uncertainties, and limitations" of the "SIP Sweep Forecast." CSC-REYNOLDS-020615, 20621, 20628. Specific discussions regarding the SIP Sweep Forecasts' assumptions were redacted from the production. The pages of heavily redacted minutes indicate that management reviewed capital stress testing scenarios similar to those from the July 20, 2016 meeting. CSC-REYNOLDS-028072. During the July 20, 2016 meeting, "Intelligent Portfolio Cash" was listed as a net interest product "related to net interest revenue." CSC-REYNOLDS-020005.

116. On October 20, 2016, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027898. The Audit Committee met to discuss an internal audit report of CSIA. CSC-REYNOLDS-012412. The internal audit report tested the "regulatory reporting/FORM ADV filing processes within CSIA." *Id*. Three issues were identified, but only one was not redacted in the production. *Id*. That issue was related to the "absence of documentation around the process and approval of queries used to obtain and validate data used in [SIP] composite performance calculation." *Id*. Therefore, the Audit Committee

was not only informed of Form ADV filing processes within CSIA, but the issues that arose from those processes.

117. On October 20, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027551. Management continued to inform the Board about the Company's promotions of SIP, including blog posts and live appearances to "educat[e]" the public about SIP. CSC-REYNOLDS-004385. The meeting's presentation materials also included updates for the Board regarding SIP models' "assumptions, limitations, uncertainties, and model overrides." CSC-REYNOLDS-004410. The details regarding the SIP models' assumptions and overrides were redacted from the production.

118. On December 14, 2016, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027561. Management continued to inform the Board about marketing efforts for SIP. CSC-REYNOLDS-004494. Although much of the presentation titled "Marketing in a Noisy, Connected and Social Media-Driven World" was redacted, it is clear that management informed the Board of 2016 marketing objectives, including using influencers to promote SIP. CSC-REYNOLDS-004566. Additionally, the minutes for this meeting referenced this presentation and what the Board and management discussed was also heavily redacted. CSC-REYNOLDS-027564.

119. On January 17, 2017, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027926. The Audit Committee approved a draft press release for January 18, 2017. CSC-REYNOLDS-012945. Fees and revenue generated from SIP were redacted from the proposed press release. CSC-REYNOLDS-012952. The press release was filed January 18, 2017. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended December 31, 2016, because there were dashes in place of where a dollar figure would be:

| | 2016 | | | | |
|---|---|---|---|---|---|
| | | Average Client Assets | | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ | 162,207 | $ | 238 | 0.58% |
| Fee waivers | | | | (31) | |
| Schwab money market funds | | 162,207 | | 207 | 0.51% |
| Schwab equity and bond funds and ETFs | | 125,814 | | 57 | 0.18% |
| Mutual Fund OneSource ® | | 198,289 | | 168 | 0.34% |
| Other third-party mutual funds and ETFs [1] | | 264,703 | | 59 | 0.09% |
| Total mutual funds and ETFs [2] | $ | 751,013 | | 491 | 0.26% |
| Advice solutions [2]: | | | | | |
| Fee-based | $ | 184,007 | | 237 | 0.51% |
| Intelligent Portfolios | | 11,119 | | - | - |
| Legacy Non-Fee | | 17,174 | | - | - |
| Total advice solutions | $ | 212,300 | | 237 | 0.44% |
| Other balance-based fees [3] | | 349,610 | | 59 | 0.07% |
| Other [4] | | | | 14 | |
| **Total asset management and administration fees** | | | **$** | **801** | |

120. On January 25, 2017, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028078. The Risk Committee met and management continued to inform the committee about the issues surroundings CSIA's regulatory reporting process focusing on Form ADV filings. CSC-REYNOLDS-021256.

121. On January 26, 2017, defendants Schwab, Adams, Bettinger, Butcher, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027582. The Board met to discuss marketing objectives for SIP. CSC-REYNOLDS-004743. Specifically, management informed the Board that the marketing department had "[d]elivered new marketing tactics to drive growth for [SIP], including a new prospect site, a video content campaign and client marketing emails focused on retirement income." CSC-REYNOLDS-004827.

122. On February 23, 2017, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027929. The Audit Committee approved the Company's Annual Report on Form 10-K for the year ended December 31, 2016. CSC-REYNOLDS-013014. Any fees or revenue generated from SIP were redacted.

The Form 10-K was filed the same day. The Form 10-K implied that SIP had not charged any fees or generated any revenue because there were dashes in place of where a dollar figure would be:

| Year Ended December 31, | 2016 | | | | |
|---|---|---|---|---|---|
| | | Average Client Assets | | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ | 164,120 | $ | 962 | 0.59% |
| Fee waivers | | | | (224) | |
| Schwab money market funds | | 164,120 | | 738 | 0.45% |
| Schwab equity and bond funds and ETFs | | 115,849 | | 217 | 0.19% |
| Mutual Fund OneSource® | | 199,389 | | 676 | 0.34% |
| Other third-party mutual funds and ETFs (1) | | 254,584 | | 222 | 0.09% |
| Total mutual funds and ETFs (2) | $ | 733,942 | | 1,853 | 0.25% |
| Advice solutions (2): | | | | | |
| Fee-based | $ | 177,409 | | 915 | 0.52% |
| Intelligent Portfolios | | 8,377 | | - | - |
| Legacy Non-Fee | | 16,969 | | - | - |
| Total advice solutions | $ | 202,755 | | 915 | 0.45% |
| Other balance-based fees (3) | | 339,071 | | 235 | 0.07% |
| Other (4) | | | | 52 | |
| Total asset management and administration fees | | | $ | 3,055 | |

123. During the same meeting, the Audit Committee reviewed presentation materials that indicated CSIA was still experiencing Form ADV filing issues. CSC-REYNOLDS-013321.

124. On April 17, 2017, defendants Goldfarb, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027935. The Audit Committee approved a draft press release for April 18, 2017. CSC-REYNOLDS-013446. Fees and revenue generated from SIP were redacted from the proposed press release. CSC-REYNOLDS-013453. The press release was filed April 18, 2017. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended March 31, 2017, because there were dashes in place of where a dollar figure would be:

| | 2017 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 162,789 | $ 231 | 0.58% |
| Fee waivers | | (8) | |
| Schwab money market funds | 162,789 | 223 | 0.56% |
| Schwab equity and bond funds and ETFs | 140,054 | 55 | 0.16% |
| Mutual Fund OneSource ® | 202,416 | 170 | 0.34% |
| Other third-party mutual funds and ETFs (1) | 272,626 | 58 | 0.09% |
| Total mutual funds and ETFs (2) | $ 777,885 | 506 | 0.26% |
| Advice solutions (2) : | | | |
| Fee-based | $ 191,727 | 244 | 0.52% |
| Intelligent Portfolios | 14,245 | — | — |
| Legacy Non-Fee | 17,441 | — | — |
| Total advice solutions (3) | $ 223,413 | 244 | 0.44% |
| Other balance-based fees (4) | 388,739 | 61 | 0.06% |
| Other (5) | | 12 | |
| **Total asset management and administration fees** | | **$ 823** | |

125. On April 20, 2017, defendants Schwab, Bettinger, Crawford, Martinetto, Adams, Dodds, Ellis, Goldfarb, Herringer, Sarin, Sneed, Butcher, McLin, Walther, Wilson, and Haraf participated in a Board meeting to discuss SIP. CSC-REYNOLDS-007037-7042. The minutes indicate that management "compared SIP to other similar digital advisory offers ('robo advisors')." CSC-REYNOLDS-007042. Tobin L. McDaniel, the Company's Senior Vice President of Investor Services, was asked several questions by directors regarding performance compared to other robo advisors, the number of SIP investors who also had a financial consultant, marketing for SIP, and how performance in SIP was measured against benchmarks. CSC-REYNOLDS-007042-7043. The minutes did not indicate or were either redacted to the point of making the directors' responses unclear. Mr. McDaniel also discussed "assets in SIP and the mix of assets between existing clients and new-to-firm clients." *Id*. The minutes' indication that the mix of assets in the SIP program were discussed creates an inference that the Board was informed of the cash allocation's impact on the mix of assets.

126. Accompanying presentation materials contained a SIP progress report for the Board. CSC-REYNOLDS-005684. The report noted that feedback from SIP customers frequently listed "No Fees" as a "Like" in favor of the service. *Id*. Therefore, defendants Schwab, Bettinger, Crawford, Martinetto, Adams, Dodds, Ellis, Goldfarb, Herringer, Sarin, Sneed, Butcher, McLin, Walther, Wilson, and Haraf knew that the Company's misleading statements obscuring hidden fees associated with SIP cash allocations were causing customers to react favorably to SIP.

127. On July 17, 2017, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027943. The Audit Committee approved a press release for July 18, 2017. CSC-REYNOLDS-013705. Fees and revenue generated from SIP were redacted from the proposed press release. CSC-REYNOLDS-013712. The press release was filed July 18, 2017. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended June 30, 2017, because there were dashes in place of where a dollar figure would be:

| | 2017 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 158,974 | $ 224 | 0.57% |
| Fee waivers | | (1) | |
| Schwab money market funds | 158,974 | 223 | 0.56% |
| Schwab equity and bond funds and ETFs | 151,825 | 52 | 0.14% |
| Mutual Fund OneSource ® | 220,680 | 179 | 0.33% |
| Other third-party mutual funds and ETFs [1] | 271,503 | 59 | 0.09% |
| Total mutual funds and ETFs [2] | $ 802,982 | 513 | 0.26% |
| Advice solutions [2] : | | | |
| Fee-based | $ 199,823 | 256 | 0.51% |
| Intelligent Portfolios | 17,796 | — | — |
| Legacy Non-Fee | 18,340 | — | — |
| Total advice solutions [3] | $ 235,959 | 256 | 0.44% |
| Other balance-based fees [4] | 406,307 | 64 | 0.06% |
| Other [5] | | 12 | |
| **Total asset management and administration fees** | | **$ 845** | |

128. On August 28, 2017, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Bettinger, Crawford, and Martinetto, participated in a Risk Committee meeting. CSC-REYNOLDS-028106. The Risk Committee met and management gave a presentation titled "Product Balances and Revenue Driver Assumptions." CSC-REYNOLDS-022636A. The presentation listed the "SIP Sweep" with percentages ranging from 0% to 72% in a slide depicting how "deposit product client rates fluctuate with the FF rate. CSC-REYNOLDS-022663A. "FF" stands for the federal funds target rate, which is the interest rate that

banks charge other institutions for lending excess cash to them from their reserve balances. The slide shows that when the federal funds target rate increases, so too does the SIP sweep:




Client Rate Matrix

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Target Fed Funds Rate - Upper Bound | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% | 4.25% | 4.50% | 4.75% | 5.00% | 5.25% |
| Target Fed Funds Rate - Lower Bound | 0.00% | 0.25% | 0.50% | 0.75% | 1.00% | 1.25% | 1.50% | 1.75% | 2.00% | 2.25% | 2.50% | 2.75% | 3.00% | 3.25% | 3.50% | 3.75% | 4.00% | 4.25% | 4.50% | 4.75% | 5.00% |

Client Rate

[redacted]

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIP Sweep(3)/SIA | 0.08% | 0.08% | 0.08% | 0.08% | 0.12% | 0.27% | 0.45% | 0.63% | 0.78% | 0.93% | 1.08% | 1.23% | 1.38% | 1.53% | 1.68% | 1.83% | 1.98% | 2.13% | 2.28% | 2.43% | 2.58% |

Up-rate Beta

[redacted]

| | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SIP Sweep/SIA | | 0.00% | 0.00% | 16.00% | 60.00% | 72.00% | 72.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% | 60.00% |

[redacted]

(3) Based on RateWatch Average Money Market Deposit Accounts $10K

Confidential — Charles Schwab 27

SUBJECT TO CONFIDENTIALITY AGREEMENT — CSC-REYNOLDS-022663A

129. On October 13, 2017, defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, Crawford, and Martinetto participated in an Audit Committee meeting. CSC-REYNOLDS-027950. The Audit Committee approved a press release for October 16, 2017. CSC-REYNOLDS-014015. Fees and revenue generated from SIP were redacted from the proposed press release. CSC-REYNOLDS-014022. The press release was filed October 16, 2017. The press release implied that SIP had not charged any fees or generated any revenue for the three months ended September 30, 2017, because there were dashes in place of where a dollar figure would be:

| | 2017 | | |
|---|---|---|---|
| | Average Client Assets | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ 158,927 | $ 220 | 0.55% |
| Fee waivers | | (1) | |
| Schwab money market funds | 158,927 | 219 | 0.55% |
| Schwab equity and bond funds and ETFs | 164,011 | 56 | 0.14% |
| Mutual Fund OneSource ® | 219,076 | 179 | 0.32% |
| Other third-party mutual funds and ETFs (1) | 291,307 | 65 | 0.09% |
| Total mutual funds and ETFs (2) | $ 833,321 | 519 | 0.25% |
| Advice solutions (2) : | | | |
| Fee-based | $ 206,781 | 265 | 0.51% |
| Intelligent Portfolios | 21,184 | — | — |
| Legacy Non-Fee | 19,022 | — | — |
| Total advice solutions (3) | $ 246,987 | 265 | 0.43% |
| Other balance-based fees (4) | 424,280 | 67 | 0.06% |
| Other (5) | | 10 | |
| **Total asset management and administration fees** | | **$ 861** | |

130. On January 16, 2018, Audit Committee defendants Goldfarb, Adams, Butcher, Dodds, Ellis, Haraf, Bettinger, and Crawford participated in an Audit Committee meeting. CSC-REYNOLDS-027964. The Audit Committee approved a press release for January 17, 2018. CSC-REYNOLDS-014673. The proposed press release, unlike previous press releases, did not separate SIP into its own category. CSC-REYNOLDS-014680. Instead, SIP was rolled into all "Advice solutions." *Id*. The press release was filed January 17, 2018. The press release for the three months ended December 31, 2017, subtly removed the line item for SIP, unlike previous press releases:

| | 2017 | | | | |
|---|---|---|---|---|---|
| | | Average Client Assets | | Revenue | Average Fee |
| Schwab money market funds before fee waivers | $ | 162,249 | $ | 200 | 0.49% |
| Fee waivers | | | | — | |
| Schwab money market funds | | 162,249 | | 200 | 0.49% |
| Schwab equity and bond funds and ETFs | | 179,764 | | 60 | 0.13% |
| Mutual Fund OneSource ® and other non-transaction fee funds | | 219,157 | | 178 | 0.32% |
| Other third-party mutual funds and ETFs (1) | | 309,007 | | 69 | 0.09% |
| Total mutual funds and ETFs (2) | $ | 870,177 | | 507 | 0.23% |
| Advice solutions (2) : | | | | | |
| Fee-based | $ | 216,546 | | 278 | 0.51% |
| Non-fee based | | 55,368 | | — | — |
| Total advice solutions | $ | 271,914 | | 278 | 0.41% |
| Other balance-based fees (3) | $ | 451,310 | | 66 | 0.06% |
| Other (4) | | | | 12 | |
| **Total asset management and administration fees** | | | **$** | **863** | |

131. Presumably during a January 25, 2018, Board meeting, defendants Schwab, Adams, Bettinger, Butcher, Dea, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto[9] reviewed a presentation titled "2018-2019 Charles Schwab Annual Capital Plan."[10] CSC-REYNOLDS-007385. The presentation included a slide titled "Deposit Product Balance Assumptions, Schwab Stress Scenario." CSC-REYNOLDS-007553. The slide stated that SIP "cash percentage remains at the observed historical range." *Id*. The assumption is rationalized because SIP is a "fully automated portfolio solution[] for clients and auto-rebalances the clients' portfolio, including the cash component." *Id*. While the presentation does not disclose the exact cash percentage, it describes

[9] CSC-REYNOLDS-027690.

[10] Although a date is not included in this presentation, the presentation is located right after presentation materials dated January 25, 2018 in the production made to Plaintiff. Further, the fact that the presentation is a plan for 2018 through 2019 creates a reasonable inference that the Board reviewed this presentation in by at least early 2018.

how the percentages remain at historical ranges. Thus, the Board knew cash allocations were holding steady at the previously discussed ranges. Further, the presentation informed the Board that SIP's auto-rebalancing feature determines the percentage of cash allocations. In other words, the presentation informed the Board that SIP cash allocations were preset. Similar slides throughout the presentation reiterated that SIP "cash percentage remains at the observed historical range." CSC-REYNOLDS-007559, 7565, 7571. Another slide stated that "[w]e assume cash percentages of SIP … will remain within the observed historical range" because of the auto-rebalancing of the cash allocations. CSC-REYNOLDS-007606.

132. The next slide of the presentation depicts a partially redacted chart[11] showing that the "SIP Min" for cash was at 10.6% during re-balancing:




---

[11] CSC-REYNOLDS-007607.

Therefore, the Board knew that the observed historical ranges for SIP cash allocations were not falling below 10.6%, and they could "assume" the cash allocations would not fall below this minimum percentage through 2019, in accordance with the Company's Capital Plan.

133. On March 13, 2018, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028128. The Risk Committee met to discuss the SIP Sweep. CSC-REYNOLDS-024356A. Accompanying presentation materials indicate that when the "Fed Funds Rate" increases, so too does the SIP cash sweep. CSC-REYNOLDS-024356A. The following slide explains that "[d]eposit product client rates fluctuate with the Fed Funds target rate." CSC-REYNOLDS-024357A.

134. On July 25, 2018, defendants Schwab, Adams, Bettinger, Dea, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Ruffel, Sarin, Sneed, Walther, Wilson, Crawford, and Martinetto participated in a Board meeting. CSC-REYNOLDS-027750. Management gave the Board a presentation describing the value of "Intelligent Portfolio Deposits" at $3 billion. CSC-REYNOLDS-008770. The presentation explained that "Intelligent Portfolio Deposits are the Schwab Bank Savings Sweep product offering for the cash component of clients' [SIP]." CSC-REYNOLDS-008772.

135. On August 27, 2018, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Bettinger, Crawford, and Martinetto participated in a Risk Committee meeting. CSC-REYNOLDS-028161. Management presented the Risk Committee with a presentation on product balances and revenue driver assumptions. CSC-REYNOLDS-025661, 25679. Accompanying presentation materials showed that, as the "Fed Funds rate" increases, so too does the SIP sweep. CSC-REYNOLDS-025683A. The following slide states that "[d]eposit product client rates fluctuate with the Fed Funds target rate." CSC-REYNOLDS-025684A.

**<u>The Board Learns that the SEC Is Conducting a Regulatory Examination Into the Same Misleading Disclosures the Board Previously Knew About and Approved</u>**

136. On October 24, 2018, defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Crawford, Bettinger, and Martinetto participated in a Risk Committee meeting discussing a "regulatory examination" of SIP. CSC-REYNOLDS-026754, 26758. Michael E. Herde, Senior Vice President and Chief

Compliance Officer, discussed "disclosure of conflicts of interest pertaining to [SIP]." CSC-REYNOLDS-026758. Mr. Herde also discussed "cash allocation in SIP and responded to a question asked by a Committee member regarding cash allocation in the portfolio." *Id*. The minutes do not indicate the specific question the director asked about cash allocations, nor does do they indicate Mr. Herde's response. *Id*. There is a reasonable inference that defendants Dodds, Adams, Haraf, McLin, Sarin, Wilson, Crawford, Bettinger and Martinetto discussed the misleading statements regarding Charles Schwab's conflict of interest and the effect of SIP cash allocations later outlined in the SEC Order.[12]

137. The accompanying presentation materials stated that the "SEC issued an examination report on the [SIP] program finding deficiencies in disclosures of conflicts of interest, the 'no fee' statements in our advertising, and raising questions as to whether the cash allocation in SIP should be considered a security under the Investment Adviser's Act." CSC-REYNOLDS-025793. The presentation further stated that management is "making changes to our disclosures, removing the 'no fee' references in our advertising, and enhancing various SIP procedures to respond to the deficiencies. Our response is due to the SEC on October 17, 2018." *Id*. The presentation also included a slide titled "Compliance Risk" which stated that the SEC found "deficiencies in disclosures of conflict of interest and marketing, amongst others." CSC-REYNOLDS-025833.

138. On October 25, 2018, defendants Goldfarb, Adams, Dodds, Ellis, Haraf, Bettinger, and Crawford met during an Audit Committee meeting to discuss "legal and regulatory matters." CSC-REYNOLDS-016786, 16789. The accompanying presentation materials again included regulatory concerns regarding the SEC's findings of "deficiencies in disclosures of conflicts of interest, the 'no fee' statements in our advertising, and raising questions as to whether the cash allocation in SIP should be considered a security under the Investment Adviser's Act." CSC-REYNOLDS-016316.

139. On October 25, 2018, defendants Schwab, Adams, Bettinger, Dea, Dodds, Ellis, Goldfarb, Haraf, Herringer, McLin, Ruffel, Sarin, Sneed, Wilson, Crawford, and Martinetto participated in a Board meeting to discuss "legal and regulatory matters." CSC-REYNOLDS-009273, 9281. The accompanying

[12] The Order, issued June 13, 2022, detailed how from March 2015 through November 30, 2018, the Company had misled investors regarding the hidden fees and the effects of the cash allocations in SIP.

presentation included a remediation status presentation which reiterated that "[t]he SEC issued an examination report on the SIP program finding deficiencies in disclosures of conflicts of interest, the 'no fee' statements in our advertising, and raising questions as to whether the cash allocation in SIP should be considered a security under the Investment Adviser's Act." CSC-REYNOLDS-009088.

140. According to the SEC Order, on November 30, 2018, following an examination of CS & Co., CSIA, and CWIA by the SEC, CS & Co. published a revised ADV brochure that removed the misleading statements, and stopped publishing the misleading advertisements. Earlier in 2018, CS & Co. had replaced SWIA as adviser to the SIP service and had published disclosures regarding SIP similar to SWIA's disclosures. CSIA has also since revised its disclosures to remove the misleading statements. The Order further states that by November 30, 2018, Charles Schwab had gained significant assets from individual retail investors and profited by almost $46 million from the spread on the SIP cash allocations. As part of the resolution to the wrongdoing, the Company's subsidiaries agreed to pay $187 million.

## THE TRUTH EMERGES

141. The truth behind the Company's business prospects and the Individual Defendants' wrongdoing began to emerge on July 2, 2021. That day, Charles Schwab disclosed in a Current Report on Form 8-K that the SEC was investigating disclosures related to the Company's SIP program and that the Company's second quarter financial results[13] would include a charge of $200 million "[g]iven the investigation's status."

142. On August 6, 2021, the Company filed its Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, with the SEC. The Form 10-Q reiterated that the SEC was investigating disclosures made concerning SIP. In particular, the Form 10-Q stated:

> Schwab Intelligent Portfolios® SEC Investigation: As disclosed on July 1, 2021, the Company has been responding to an enforcement investigation by the SEC arising from a compliance examination and concerning historic disclosures related to the Schwab Intelligent Portfolios digital advisory solution. In connection with a tentative agreement reached with SEC staff to resolve the matter, second quarter 2021 financial results included

[13] The 2021 second quarter financial results were later disclosed in a Current Report on Form 8-K filed with the SEC on July 16, 2021. The Form 8-K did include the $200 million charge related to the Company's SIP program.

> a liability and related non-deductible charge of $200 million. Completion of any settlement is always contingent on a vote of the Commission. The Company continues to cooperate with SEC staff with the goal of fully resolving the matter.

143. On November 8, 2021 and May 9, 2022, the Company filed Quarterly Reports on Forms 10-Q for the quarters ended September 30, 2021 and March 31, 2022, respectively. Those Forms 10-Q made substantially similar statements regarding the $200 million charge.

144. On June 13, 2022, the full truth emerged when the SEC filed the Order regarding the SIP scheme. The Order revealed that from March 2015 through November 2018, the Company's subsidiaries made false and misleading statements in their Form ADV filings about the cash component of SIP. The Company and its subsidiaries also made false and misleading statements in their Form ADV filings regarding both their conflict of interest in setting the cash allocations at a level that would earn a minimum amount of revenue, as well as the effect of the cash allocations.

145. The Company's disclosure failures were compounded by the fact that, around the same time, the Company launched a marketing campaign that included advertising stating that SIP was a no-advisory-fee product, which Charles Schwab viewed as a strong competitive advantage over other robo-advisers, and falsely implying that investing in SIP allowed investors to keep more of their money than other advisory services that charged a fee. As a result, investors were unable to make a fully informed decision regarding whether the lack of an advisory fee benefited them.

146. According to the Order, SWIA's and CSIA's revised ADV brochures stated, "The cash allocation can affect both the risk profile and performance of a portfolio. This was misleading because according to Schwab's internal analyses, the cash allocations would in fact lower the returns of the portfolios when other assets such as equities outperform cash."

147. SWIA's revised ADV brochure stated, "The higher the [cash] Allocation and the lower the interest rate paid the more Schwab Bank earns, thereby creating a potential conflict of interest… To mitigate any potential conflict … the Program strategies [are constructed] pursuant to modern portfolio theory, which seeks to construct an optimal return goal for a portfolio based on the level of risk an investor is willing to take." CSIA's ADV brochure was the same, except that it stated that the strategies were constructed pursuant to "modern portfolio theory and behavioral factors."

148. The Order explained that these statements were misleading for two reasons. First, there was an actual, not a potential, conflict of interest between the investors and Schwab regarding the size of the cash allocations in the portfolios. Second, the pre-set cash allocations in the SIP portfolios prevented returns being maximized at given levels of risk. Under normal market conditions where other assets such as equities outperform cash, the cash allocations in the investors' portfolios would lower clients' returns by approximately the same amount as an advisory fee would have. The statements implied the opposite—that investing in SIP allowed investors to keep more of their money than other advisory services that charged a fee. Therefore, the references to modern portfolio theory (which seeks to maximize returns at given levels of risk) without reference to the impact of the cash constraints, were misleading. The SEC stated that the misleading statements caused investors to be incapable of making "fully informed decisions."

149. Further, the Order found that the advertising campaign by the Company in March 2015 was misleading because it often stated that there were "no hidden fees [and] no advisory fees" for SIP. The SEC reviewed Charles Schwab's internal documents which claimed the opposite—that "the cash allocations in SIP would, when other assets such as equities outperform cash, reduce investors' returns by approximately as much as advisory fees would have." The Order also included an example of an advertisement that claimed investors would make more money as a result of not being charged an advisory fee:

**Figure 1: Fees can eat away at your bottom line**




Source: Schwab Center for Financial Research. Portfolio example assumes annualized return of 6%, investment advisory fee of 1% vs 0%. Not representative of any specific investment or product. **Past performance is no guarantee of future results.**

Remember, time is on your side, and investing in your 20s historically has increased the likelihood that you'll reach your financial goals. With a Schwab Intelligent Portfolios™ account, you can start investing right away with a growth-oriented, low-cost portfolio of exchange-traded funds. Isn't it time to get going?

1. The Institute for College Access and Success, "Student Debt and the Class of 2015," October 2015.
2. U.S. Census Bureau, "Young Adults, Then and Now," 2013.
3. Claes Bell, "Did you miss the stock market rally? You're not alone," Bankrate.com, 4/9/2015.

⊕ Disclosures

Schwab Intelligent Portfolios charges no advisory fees. Schwab affiliates do earn revenue from the underlying assets in Schwab Intelligent Portfolios accounts. This revenue comes from managing Schwab ETFs™ and providing services relating to certain third-party ETFs that can be selected for the portfolio, and from the cash feature on the accounts. Revenue may also be received from the market centers where ETF trade orders are routed for execution.

Please see the Schwab Intelligent Portfolios disclosure brochures (https://www.schwab.com/public/file/CMS-BDL100049) for information related to the cash feature in Schwab Intelligent Portfolios.

150. While the Company's subsidiaries stopped issuing the misleading statements on November 30, 2018, the Order explained that the damage was already done. By November 30, 2018, the Company's subsidiaries had "gained significant assets from individual retail investors and profited by almost $46 million from the spread on the SIP cash allocations."

151. As the Order pointed out, Charles Schwab's actions violated several sections of the Advisers Act. In particular, Section 206(2) makes it unlawful for an adviser to engage in any course of business that operates as a fraud or deceit upon any client or prospective client; Section 206(4) prohibits an investment adviser from engaging in any act which is fraudulent, deceptive, or manipulative; and Rule 206(4)-1(a)(5) makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within

the meaning of Section 206(4) of the Advisers Act for a registered investment adviser to publish, circulate, or distribute any advertisement which contains any untrue statement of a material fact, or which is otherwise false or misleading. As a result of the wrongdoing described above, "SWIA, CSIA, and CS & Co. willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which require a registered investment adviser to adopt and implement written compliance policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder."

152. The Order explained that SWIA, CSIA, and CS & Co. agreed to cooperate fully with the SEC in any investigations, litigations, or other proceedings relating to the SIP scheme. CSIA and CS & Co. were ordered to cease and desist from committing further violations of the Advisers Act. The Company's subsidiaries agreed to pay $187 million. The payment consists of approximately $52 million in disgorgement and a $135 million civil money penalty.

153. The Order also requires Charles Schwab's subsidiaries to undergo certain corporate governance reforms. CS & Co. and CSIA have undertaken to retain the services of an Independent Compliance Consultant ("Independent Consultant"). The Independent Consultant's compensation and expenses are borne exclusively by CS & Co. and CSIA. The Independent Consultant was required to conduct a comprehensive review of CS & Co.'s and CSIA's current supervisory, compliance, and other policies and procedures. The purpose of the review was to ensure that CS & Co.'s and CSIA's disclosures, advertising, and marketing communications with clients or potential clients, as defined by Rule 206(4)-1, relating to SIP comply with the content, books and records, and other requirements of federal laws.

154. After the review, the Independent Consultant was required to submit a detailed written report of its findings to CS & Co. and CSIA and to the Commission staff (the "Report"). The Report included the Independent Consultant's recommendations for changes in or improvements to CS & Co.'s and CSIA's policies and procedures or disclosures to clients, and a procedure for implementing recommended improvements to CS & Co.'s and CSIA's policies and procedures or disclosures. CS & Co. and CSIA was required to adopt all recommendations contained in the Report.

## DAMAGES TO CHARLES SCHWAB

155. As a result of the Individual Defendants' improprieties, Charles Schwab's subsidiaries disseminated improper, public statements concerning SIP.

156. Charles Schwab's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, Charles Schwab's current and potential clients consider a company's ability to honestly advertise its products and services. Retail investors are less likely to invest with Charles Schwab when the Company is creating elaborate schemes to hide advisor fees. Charles Schwab's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements have materially increased the perceived risks of investing in and lending money to the Company.

157. Further, as a direct and proximate result of the Individual Defendants' actions, Charles Schwab has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from $52 million disgorgement;

(b) costs incurred from the $135 million civil penalty;

(c) costs incurred from ongoing investigations, litigations, or other proceedings related to the Order;

(d) costs incurred from the hiring of the Independent Consultant and implementation of governance changes recommended in the Report; and

(e) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Charles Schwab.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

158. Plaintiff brings this action derivatively in the right and for the benefit of Charles Schwab to redress injuries suffered, and to be suffered, by Charles Schwab as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Charles Schwab is named as a nominal defendant solely in a derivative capacity.

159. Plaintiff will adequately and fairly represent the interests of Charles Schwab in enforcing and prosecuting its rights.

160. Plaintiff was a stockholder of Charles Schwab at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Charles Schwab stockholder.

161. The current Board of Charles Schwab consists of the following seventeen individuals: defendants Schwab, Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, and Sneed and non-defendants Brown, Levitt, Martin-Flickinger, Masrani, Ricketts, and Schwab-Pomerantz. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

162. As discussed in detail above, defendants Schwab, Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, and Sneed breached their fiduciary duties of loyalty by causing or allowing the Company's subsidiaries to make improper statements regarding SIP that resulted in at least $187 million in damages to the Company. Demand is therefore futile as to each of these eleven director-defendants, who together constitute a majority of the Company's current Board. Further, demand is also futile as to non-defendant directors Levitt, Masrani, and Schwab-Pomerantz because each lacks independence from one or more of the current director defendants. In total, demand is therefore futile as to at least fourteen members of Charles Schwab's current seventeen-member Board.

**Defendant Schwab**

163. Defendant Schwab is the founder of the Company and served as its CEO for most of its history since the Company's founding in 1971. He has been co-chairman of the Board with current CEO Bettinger since July 2022. Defendant Schwab has been a director of the Company since its incorporation in 1986. The principal professional occupation of defendant Schwab is his employment with the Company, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. According to the Company's Proxy Statement on Form DEF 14A filed with the SEC on March 31, 2023 (the "Proxy"), defendant Schwab is not independent because he is a Company employee. His compensation is not included with the non-employee directors and he has had an employment contract with the Company since 1987.

164. Defendant Schwab is listed as a named executive officer alongside Bettinger, Crawford, and Martinetto. For fiscal years 2022, 2021, and 2020, he has received approximately $7.9 million, $7.8 million and $6.1 million, respectively, in total compensation. Accordingly, defendant Schwab lacks independence from defendants Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, Sneed, and non-defendants Brown, Levitt, Martin-Flickinger, Masrani, Ricketts, and Schwab-Pomerantz due to his interest in maintaining his executive position at the Company. Notably, the Company does not classify defendant Schwab as an independent director under the New York Stock Exchange ("NYSE") rules. Accordingly, defendant Schwab is incapable of impartially considering a demand. Demand is futile as to defendant Schwab on this ground alone.

165. In addition, defendant Schwab breached his fiduciary duties of loyalty and care by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Schwab's position as the founder of the Company, he failed to correct the SIP-related violations for almost four years. Defendant Schwab knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

166. Defendant Schwab also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Schwab attended 20 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Schwab's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1.

167. Thus, defendant Schwab faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Schwab is, therefore, futile.

**Defendant Bettinger**

168. Defendant Bettinger has been CEO and a member of the Board since 2008. He has been Co-Chairman of the Board with defendant Schwab since July 2022. Defendant Bettinger also serves on the board of directors of CS & Co. and Schwab Bank. He also served as President of the Company from 2008 until 2021. The principal professional occupation of defendant Bettinger is his employment with Charles Schwab, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits, as discussed above. Accordingly defendant Bettinger lacks independence from defendants Schwab, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, Sneed, and non-defendants Brown, Levitt, Martin-Flickinger, Masrani, Ricketts, and Schwab-Pomerantz due to his interest in maintaining his executive position at the Company. Notably, the Company does not classify defendant Bettinger as an independent director under the NYSE rules. As the Company concedes, in the Proxy, defendant Bettinger is not independent because he is a Company employee. Accordingly, defendant Bettinger is incapable of impartially considering a demand. Demand is futile as to defendant Bettinger on this ground alone.

169. As alleged above, defendant Bettinger breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Bettinger's positions at the Company, CS & Co., and Schwab Bank, he failed to correct the SIP-related violations for almost four years. Defendant Bettinger knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

170. Defendant Bettinger also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Bettinger attended 53 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations

on customer accounts. Defendant Bettinger's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1.

171. Thus, defendant Bettinger faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Bettinger is, therefore, futile.

**Defendant Adams**

172. Defendant Adams has been a Charles Schwab director since 2015 and a member of the board of directors of Schwab Bank since 2015. He has served as a member of the Company's Audit Committee from March 2015 to March 2019, and has served as the Chair of the Audit Committee since March 2020. Defendant Adams was a member of the Company's Risk Committee from at least March 2015 through March 2020.

173. As alleged above, defendant Adams breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA, and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Adams' positions at the Company and Schwab Bank, he failed to correct the SIP-related violations for almost four years. Defendant Adams knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

174. Defendant Adams also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. Further, defendant Adams was a member of Schwab Bank's board while the misleading statements were made. As the SEC pointed out, this created a conflict of interest between the investors and Schwab Bank. While the Company made materially misleading statements, defendant Adams attended 50 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Adams's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1.

175. Thus, defendant Adams faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Adams is, therefore, futile.

**Defendant Dea**

176. Defendant Dea has been a Charles Schwab director since October 2017, and a member of the board of directors of Schwab Bank since 2011.

177. As alleged above, defendant Dea breached her fiduciary duty of loyalty by abdicating her responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Dea's positions at the Company and Schwab Bank, she failed to correct the SIP-related violations for almost four years. Defendant Dea knew of the duties imposed upon her but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

178. Defendant Dea also breached her fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. Further, defendant Dea was a member of Schwab Bank's board while the misleading statements were made. As the SEC pointed out, this created a conflict of interest between the investors and Schwab Bank. While the Company made materially misleading statements, defendant Dea attended three meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Dea's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1.

179. Thus, defendant Dea faces a substantial likelihood of liability for her breach of fiduciary duties. Any demand upon defendant Dea is, therefore, futile.

**Defendant Dodds**

180. Defendant Dodds has been a Charles Schwab director since 2014. From 1986 to 2007, defendant Dodds held several executive positions at the Company, including Executive Vice President

and Chief Financial Officer. He has served as a member of the board of directors of Schwab Bank since 2007. Defendant Dodds has been Chairman of the Company's Risk Committee since March 2015.

181. As alleged above, defendant Dodds breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Dodds' positions at the Company and Schwab Bank, he failed to correct the SIP-related violations for almost four years. Defendant Dodds knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

182. Defendant Dodds also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. Further, defendant Dodds was a member of Schwab Bank's board while the misleading statements were made. As the SEC pointed out, this created a conflict of interest between the investors and Schwab Bank.

183. While the Company made materially misleading statements, defendant Dodds attended 54 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Dodds's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1.

184. Thus, defendant Dodds faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Dodds is, therefore, futile.

**Defendant Ellis**

185. Defendant Ellis has been a Charles Schwab director since 2012. He was a member of the Company's Risk Committee from at least March 2015 through March 2017.

186. As alleged above, defendant Ellis breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company.

CSIA, and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Ellis' position at the Company, he failed to correct the SIP-related violations for almost four years. Defendant Ellis knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

187. Defendant Ellis also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Ellis attended 33 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Ellis's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

188. Thus, defendant Ellis faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Ellis is, therefore, futile.

**Defendant Goldfarb**

189. Defendant Goldfarb has been a Charles Schwab director since 2012, and a member of Schwab Bank's board of directors since 2021.

190. As alleged above, defendant Goldfarb breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Goldfarb's position at the Company, he failed to correct the SIP-related violations for almost four years. Defendant Goldfarb knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

191. Defendant Goldfarb also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant

Goldfarb attended 43 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Goldfarb's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

192. Thus, defendant Goldfarb faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Goldfarb is, therefore, futile.

**Defendant Herringer**

193. Defendant Herringer has served as a Charles Schwab director since 1996.

194. As alleged above, defendant Herringer breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Herringer's position at the Company, he failed to correct the SIP-related violations for almost four years. Defendant Herringer knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

195. Defendant Herringer also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Herringer attended 19 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Herringer's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

196. Thus, defendant Herringer faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Herringer is, therefore, futile.

**Defendant Ruffel**

197. Defendant Ruffel has served as a Charles Schwab director since May 15, 2018 and Schwab Bank director since 2018.

198. As alleged above, defendant Ruffel breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Ruffel's positions at the Company and Schwab Bank, he failed to correct the SIP-related violations. Defendant Ruffel knew of the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

199. Defendant Ruffel also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. Further, defendant Ruffel was a member of Schwab Bank's board while the misleading statements were made. As the SEC pointed out, this created a conflict of interest between the investors and Schwab Bank.

200. While the Company made materially misleading statements, defendant Ruffel attended two meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Ruffel's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

201. Thus, defendant Ruffel faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Ruffel is, therefore, futile.

**Defendant Sarin**

202. Defendant Sarin has served as a Charles Schwab director since 2009. He has been a member of the Company's Risk Committee since March 2018.

203. As alleged above, defendant Sarin breached his fiduciary duty of loyalty by abdicating his responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Sarin's position at the Company, he failed to correct the SIP-related violations for almost four years. Defendant Sarin knew of

the duties imposed upon him but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

204. Defendant Sarin also breached his fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Sarin attended 39 meetings, described in further detail herein, that collectively show he knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Sarin's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

205. Thus, defendant Sarin faces a substantial likelihood of liability for his breach of fiduciary duties. Any demand upon defendant Sarin is, therefore, futile.

**Defendant Sneed**

206. Defendant Sneed has served as a Charles Schwab director since 2002.

207. As alleged above, defendant Sneed breached her fiduciary duty of loyalty by abdicating her responsibility to exercise proper oversight of the Company. SWIA was a subsidiary of the Company. CSIA and CS & Co. are subsidiaries of the Company. The SEC found that all three entities violated the Advisers Act which resulted in at least $187 million in damages. Despite defendant Sneed's position at the Company, she failed to correct the SIP-related violations for almost four years. Defendant Sneed knew of the duties imposed upon her but failed to act, and as a result, the Company failed to implement adequate compliance management programs to protect against the SIP-related misstatements.

208. Defendant Sneed also breached her fiduciary duties of care and loyalty by causing or permitting the Company's subsidiaries to make improper statements in the ADV disclosures and SIP-related advertising campaign. While the Company made materially misleading statements, defendant Sneed attended 20 meetings, described in further detail herein, that collectively show she knew the truth about the Company's conflict of interest with SIP customers and the negative effect of SIP cash allocations on customer accounts. Defendant Sneed's attendance at meetings where the Board discussed SIP cash allocations is further illustrated by the chart attached hereto as Exhibit 1

209. Thus, defendant Sneed faces a substantial likelihood of liability for her breach of fiduciary duties. Any demand upon defendant Sneed is, therefore, futile.

**The Audit Committee Defendants**

210. Defendants Adams, Dodds, Ellis, Goldfarb, Sarin, Butcher, and Haraf, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with legal and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly allowing the improper statements related to the Company's SIP scheme. Despite their knowledge, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**The Risk Committee Defendants**

211. Defendants Adams, Dodds, Ellis, and Sarin, as members of the Risk Committee, breached their fiduciary duty of loyalty by failing to implement an appropriate enterprise-wide risk management framework despite this responsibility falling directly under their purview and failing to appropriately oversee the Company's regulatory submissions. The Risk Committee Defendants completely and utterly failed to fulfill their responsibilities to oversee the Company's enterprise-wide risk management framework and Corporate Risk function, as required by the Risk Committee Charter in effect at the time.

**Non-Defendants Levitt and Masrani**

212. As a result of the transactions the Company has with TD Bank, TD Bank has designated Masrani and Levitt as directors of Charles Schwab. Non-defendants Masrani and Levitt are beholden to defendants Schwab, Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, and Sneed because of the Company's transactions with TD Bank. The Company and subsidiaries of TD Bank (together, the "TD Depository Institutions") entered into an amended and restated insured deposit account agreement (the "IDA agreement"). In accordance with the IDA Agreement, which became effective October 6, 2020, cash held in eligible brokerage client accounts is swept off balance sheet to deposit

accounts at the TD Depository Institutions. The Company provides recordkeeping and support services to the TD Depository Institutions with respect to the deposit accounts for which the Company receives an aggregate monthly fee. During 2022, the Company generated approximately $1.3 billion in revenue from bank deposit account fees under the IDA Agreement.

213. On May 5, 2023, TD Bank confirmed it entered into an amended IDA Agreement with Charles Schwab. In comparison to the existing agreement, the revised agreement extends the term by three years to July 1, 2034, and provides for lower deposit balances in its first six years, for higher balances in the latter years. Specifically, until September 2025, the aggregate amount of fixed rate obligations will serve as the floor. Thereafter, the floor will be set at $60 billion up from $50 billion in the existing agreement. This robust agreement provides TD Bank with greater certainty around future deposit balances while providing Charles Schwab additional flexibility and strengthening TD Bank's partnership with Charles Schwab. Non-defendant Masrani, CEO of TD Bank, stated "[w]e are pleased to further extend our agreement with [Charles] Schwab .... Our relationship with [Charles] Schwab, one of the leading investment services firms in the U.S., delivers strategic and financial value to TD and our shareholders."

214. Notably, the Company does not classify non-defendant Masrani as an independent director under the NYSE rules. Masrani and Levitt cannot independently assess a demand against a majority of the Company's Board—defendants Schwab, Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb, Herringer, Ruffel, Sarin, and Sneed—without jeopardizing TD Bank's multi-billion dollar relationship with Charles Schwab. Accordingly, non-defendants Masrani and Levitt are incapable of impartially considering a demand. Any demand upon non-defendants Masrani and Levitt is, therefore, futile.

**Non-Defendant Schwab-Pomerantz**

215. According to the Proxy, the Company does not classify non-defendant Schwab-Pomerantz as an independent director under the NYSE rules. Non-defendant Schwab-Pomerantz is the daughter of the Company's founder—defendant Schwab. Given her immediate familial connection with defendant Schwab, non-defendant Schwab-Pomerantz lacks independence from someone who faces a substantial likelihood of liability on claims that would be the subject of a demand. Non-defendant Schwab-Pomerantz cannot investigate and asses a demand against defendants Bettinger, Adams, Dea, Dodds, Ellis, Goldfarb,

Herringer, Ruffel, Sarin, and Sneed without also subjecting her father to potential liability. Accordingly, non-defendant Schwab-Pomerantz is incapable of impartially considering a demand. Any demand upon non-defendant Schwab-Pomerantz is, therefore, futile.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

216. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

217. The Individual Defendants owed and owe Charles Schwab fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Charles Schwab the highest obligation of loyalty and care.

218. The Individual Defendants and each of them, violated and breached their fiduciary duties.

219. The Officer Defendants knew of the illegal activity which had a substantial magnitude and duration. The Officer Defendants knew that the Company and its subsidiaries' statements concerning SIP were misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

220. The Director Defendants, as directors of the Company, owed Charles Schwab the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the elaborate SIP hidden fee scheme. The Director Defendants knew that: (i) there were hidden fees in SIP in the form of pre-set cash allocations which created a "cash-drag" that lowered investors' returns; and (ii) there was an actual conflict of interest in setting the cash allocation amounts. Accordingly, these defendants breached their duty of loyalty to the Company.

221. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight. The Audit Committee Defendants failed in their duty to appropriately disclose the effects of the cash-drag on SIP customer returns and Company revenues, as

well as the resultant conflict of interest, as required by the law and the Audit Committee Charter in effect at the time.

222. The Risk Committee Defendants breached their fiduciary duty of loyalty by failing to implement an appropriate enterprise-wide risk management framework despite this responsibility falling directly under their purview and failing to appropriately oversee the Company's regulatory submissions. The Risk Committee Defendants completely and utterly failed to fulfill their responsibilities to oversee the Company's enterprise-wide risk management framework and Corporate Risk function, as required by the Risk Committee Charter in effect at the time.

223. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Charles Schwab has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

224. Plaintiff, on behalf of Charles Schwab, has no adequate remedy at law.

## **COUNT II**

### **Against the Individual Defendants for Waste of Corporate Assets**

225. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

226. As a result of the Individual Defendants' failure to properly supervise and monitor the adequacy of the Company's internal controls and its compliance with the law, the Individual Defendants have caused Charles Schwab to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

227. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

228. Plaintiff, on behalf of Charles Schwab, has no adequate remedy at law.

## **COUNT III**

### **Against the Individual Defendants for Unjust Enrichment**

229. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

230. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Charles Schwab. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Charles Schwab.

231. Plaintiff, as a stockholder and representative of Charles Schwab, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

232. Plaintiff, on behalf of Charles Schwab, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Charles Schwab, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing Charles Schwab to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Charles Schwab and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Board's oversight of risk management and internal controls over regulatory compliance over the Company and its subsidiaries;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3. a provision to permit the stockholders of Charles Schwab to nominate at least three candidates for election to the Board; and

4. a proposal to strengthen Charles Schwab's oversight of its disclosure procedures;

C. Extraordinary equitable or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Charles Schwab has an effective remedy;

D. Awarding to Charles Schwab restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: August 31, 2023

ROBBINS LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
MATTHEW G. LEAGRE (*pro hac pending*)

*/s/ Kevin A. Seely*
KEVIN A. SEELY

5060 Shoreham Place, Suite 300
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
kseely@robbinsllp.com
mleagre@robbinsllp.com

Attorneys for Plaintiff

1636022